[No. 31259. Department One. August 22, 1950.]

FULTON COOK, *Appellant,* v. L. D. JOHNSON, *Respondent.*[1]

[1]Reported in 221 P. (2d) 525.

*Edward J. Crowley,* for appellant.

*J. P. Burson* and *G. Kent Burson,* for respondent.

SCHWELLENBACH, J.—Some time during the fall of 1947, Fulton Cook of St. Maries, Idaho, sold a ranch near St. Maries to L. D. Johnson of Rosalia, Washington. The ranch was located in the lowlands, and the drainage ditch had become somewhat clogged. Cook owned a dragline, and, after the sale, negotiations were carried on between the two for Cook to move his equipment to the ranch and clean out and extend the ditch.

December 20, 1947, Johnson wrote Cook:

"Mr. Fulton Cook
St Maries Idaho.
"Dear Mr Cook

"I thot I wod drop you a line to day I ham hopen this finds you folks all O.K. with best wishes to you and famley. I am bout thee same as ever I am planen on goen way the first of thee year someplase

"Bout the ditchen you was to dow on my Farm goe a head and dow thee work what you think to bee needed and I will pay you later on when you send me thee bill I may not see you bee fore I goe away

"your Truly
"[signed] L. D. Johnson"

Cook replied December 23rd:

"If everything progresses satisfactorly and we do not have too much extreme weather conditions we will be at your ranch ready to extend the ditches for you by about January 20th. I have something like three weeks work with my machine on my ranch before I can get to your work but you can count on me doing the work as I promised you just as soon as I can get to it."

January 22, 1948, Johnson sold the ranch under a conditional sales contract to Harry Fink, and shortly thereafter Fink went into possession. Johnson then went to California and returned March 27th or 28th.

At the time he wrote the letter of December 20th, Johnson was negotiating the contract with Fink. He did not notify Cook, however, of this fact. He never at any time notified Cook concerning the contract with Fink or the change of possession. He never at any time attempted to revoke his offer to Cook.

Cook learned of the contract of sale shortly after it was made, and knew that Fink was in possession. He testified that he did not contact Johnson because he did not know where he was.

Cook moved his equipment onto the ranch the early part of April and worked from April 19th to May 19th. The court found that the charge of $1,790 for work and labor performed was reasonable. Cook testified that the delay in commencing the work was due to an unusually heavy frost that year.

Upon Johnson's return from California, before going on to Rosalia, he spent a few days in Spokane. Fink met him there and made a payment on the contract. He told Johnson that Cook was on the ranch, preparing to commence the work. Fink testified:

"I asked Mr. Johnson about the deal on the ditching and he said to go ahead, to tell Mr. Cook to go ahead as agreed."

He testified that he so advised Cook (who was then at the ranch ready to start) upon his return that evening.

As to this conversation, Johnson testified:

"He wanted to know what bargain I had made with Cook to do this ditching that Cook did and I said the ditching was to be done at cost and he would have to talk to Cook himself about getting a price on it, I had nothing to do with it any more."

Shortly after June 1st, Johnson, in response to a letter from Fink, went to St. Maries. While there, he was handed a statement by Cook for the work performed. This was the first time the two had met or had corresponded with each other since the exchange of letters the previous December. Their testimony as to what transpired at this meeting is so

conflicting that a recounting of it would serve no useful purpose. However, upon his return home, Johnson wrote Cook on June 10th:

"Mr. Fulton Cook                      June 10, 1948
St. Mery's Ida.
"Dear Mr. Cook

"I never node what was goen on when I was talken to you the other day till it was two late bout this steem shuvell work it seems like Finch thinks I was to pay for that work I cant under stand how he got that idey less Watkins led him to beeleve this  when I sold this place thrue watkins I was to have sow much Clear and now back Bills to come up he sed he Had Ryle Part fixed that way  he acts couney dum on that questen′sow dos Fink but never come rite out with it but talked bout thee work quite freely last spring he asked me what deal I had with you I told him you spoke of doen thee work at cost and I dident have eney plan to tell him.

"Of Corse if I was to pay it it make eney diference what prise it wood be of corse things has turned out quite different now and mabe things look difernt I have told Watkins I dident want eney tales tide on my Deals I will see you later on bout this deal I can let him have some money some time if he gits up agin eney thing but I fige thee best way is to drift a long for a while and see how things goes

"Best wishes
"[signed] L. D. Johnson"

To this letter Cook replied:

"Big Meadow Ranch
St. Maries, Idaho
June 21st, 1948

"Mr. L. D. Johnson,
Rosalia, Wash.
"Dear Mr. Johnson:

"In reply to your letter of the 10th inst. relative to account for ditching on the ranch I sold to you, there is some misunderstanding about who is to pay the account appearantly between you and Mr. Finck.

"In your letter to me dated December 20th 1947 you stated in regard to the ditching as follows:

" 'About the ditching you was to do on my farm go ahead and do the work what you think to be needed and I will pay you later on when you send me the bill'

"I answered your letter of Dec. 20th and stated that I would get to this work as soon as possible. I also asked Mr.

Fink who was to pay for this work and he stated that he had talked with you about this ditching and that you would help him if he needed it.

"Naturally, with your letter of Dec. 20th instructing me to do this work and send you the bill and you would pay for it and Mr. Finck saying to go ahead with the work I do not see where there is any question about the payment. I do not care who pays for the work, either Mr. Fink or you that is immaterial. I think you and Mr. Finck should get together and settle this matter as I do not wish to have any trouble over it.

"I have a great deal of expense this year and need the money so, I will expect an immediate reply.

"Yours truly,

"[signed] Fulton Cook"

Upon trial of an action by Cook against Johnson, the trial court concluded that there was no valid contract or meeting of minds between the parties as a result of the exchange of letters of December 20, 1947, and December 23, 1947, and entered judgment dismissing the action with prejudice. This appeal follows.

▆▆▆ The law recognizes, as a matter of classification, two kinds of contracts—bilateral and unilateral. A bilateral contract is one in which there are reciprocal promises. The promise by one party is consideration for the promise by the other. Each party is bound by his promise to the other. A unilateral contract is a promise by one party—an offer by him to do a certain thing in the event the other party performs a certain act. The performance by the other party constitutes an acceptance of the offer and the contract then becomes executed. Until acceptance by performance, the offer may be revoked either by communication to the offeree or by acts inconsistent with the offer, knowledge of which has been conveyed to the offeree. An example of this class of contract is the offer of a reward. 17 C.J.S. 326, Contracts, § 8; 1 Page on Contracts 65, § 51; *Mowbray Pearson Co. v. E. H. Stanton Co.*, 109 Wash. 601, 187 Pac. 370, 190 Pac. 330, and cases cited therein. *Higgins v. Egbert*, 28 Wn. (2d) 313, 182 P. (2d) 58.

■ The letters between the parties indicate that they had negotiated for some time with reference to appellant cleaning out and extending the ditches. Those negotiations culminated in an offer by respondent to pay upon performance by appellant and upon appellant's submission of a bill to him. Up to that point, appellant was not obligated to perform. He could have accepted the offer by performance. But he went further than that and promised to do the work. The promises of the two men thereby became reciprocal and binding, each upon the other. The two letters constitute a binding reciprocal agreement between the parties. There was a definite proposal by respondent which was unconditionally accepted by appellant. The minds of the parties met. See *Lost Lake Lbr. Co. v. Smith*, 29 Wash. 713, 70 Pac. 134.

In *Mowbray Pearson Co. v. E. H. Stanton Co., supra,* the Stanton Company executed and delivered the following offer in writing:

" 'In consideration of Mowbray Pearson Company soliciting and delivering ice in Spokane north of the Spokane river to Olive street bridge and north of N. P. R. R. east of Olive street bridge and south of Cora avenue west of Division street, and Dalton avenue, east of Division street, E. H. Stanton Co. agrees to sell pure merchantable ice to Mowbray Pearson Company for $1.50 per ton at their plant for their requirements during 1916, and further agrees not to sell any other dealer for distribution in that district.' "

The Pearson Company wrote the word "accepted" upon the contract. It was contended that that made the contract bilateral. We pointed out, however, that by writing the word "accepted", the Pearson Company merely agreed to the terms of the writing and did not promise to solicit and deliver ice in the district defined. Here appellant went further than merely agreeing to the terms of respondent's writing. He did more than to indicate an intention to accept respondent's offer by performance. He promised to do the work. His promise was just as binding as that of the respondent.

In *Dement Brothers Co. v. Coon,* 104 Wash. 603, 177 Pac. 354, the following writings occurred:

" 'August 4, 1916.

" 'I sell to Dement Bros. Co. 6,000 bushels of Bluestem wheat, basis No. one grade, 201 sacks turkey red wheat basis No. one grade, and 500 bushels forty-fold wheat basis No. one grade, all at $1.03½ per bushel f. o. b. Reese or Welland sellers option. Delivery to be made on or before Sept. 30, 1916.

" 'Confirmed                                             Carl Coon.
" 'Dement Bros. Co.
" 'By Morrison.

" 'We, the undersigned, hereby agree to an extension of time of delivery on the wheat contract of Aug. 4, 1916, to Dec. 1, 1916, instead of Sept. 30, 1916. All other conditions of contract to remain the same.

" 'Dement Bros. Co.

" 'By Morrison        Carl Coon.' "

No wheat was delivered, and in an action for damages the plaintiff recovered. Upon appeal, the first error assigned was that the contract was void for want of mutuality. We said:

"As to the first contention: The contract is an executory one and evidently it was intended to be, and is, bilateral. Appellants argue that the contract contains no promise on the part of respondent to receive the wheat nor to pay for it. We are satisfied to the contrary. By the writing, signed by Carl Coon, he said that he sells wheat to respondent, future delivery, at a stated price, f. o. b. at either of two places the seller prefers. Respondent wrote the word 'confirmed' and signed it. Thereafter there was written on the instrument an agreement extending the time for delivery of wheat and a reaffirmance of all other conditions of the contract, which was signed by both parties. The rule by which we determine the intent of the parties and the meaning, or lack of meaning, of such a written instrument does not encourage an attempt to charm or transform it into a word puzzle, nor to do otherwise than take the words and signatures in their ordinary, everyday, popular sense. The contract is not an option given by Carl Coon, nor is it a unilateral agreement, such as the offer of a reward. By it Carl Coon said he sells wheat, future delivery, at a certain price, to Dement Brothers Company. It is impossible to sell unless at the same time there is a purchaser. The one obligation

must have its corresponding and correlative obligation. Therefore, when Carl Coon signed the contract, he obligated himself to sell wheat, future delivery, at the price stated, to Dement Brothers Company, and when the latter wrote on it the word 'confirmed' and then signed it, respondent entered into the correlative obligation of purchasing wheat, future delivery, at the price stated, from Carl Coon. The same may be said with reference to the obligation of respondent to receive the wheat."

In a unilateral contract, the offer may be revoked by the offeror before acceptance by performance by the offeree. *Mowbray Pearson Co. v. E. H. Stanton Co., supra.* But such an offer may not be revoked by either party to a bilateral contract. A bilateral contract may be rescinded, but only with the consent of both parties. *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381. That was not done here.

Respondent contends that it became appellant's duty, after learning of the conditional sale to Fink, coupled with Fink's possession of the property, to contact respondent before performing—that, under the circumstances, he proceeded with the work at his peril. That might have been true if the contract were unilateral. However, we are here considering the reciprocal promises of the parties, each to the other—a bilateral contract. It was respondent's duty, if he wished to be relieved of his obligation to pay for the work, to contact appellant and attempt to have him agree to a rescission. Furthermore, although the testimony as to what transpired at the meeting in Spokane between respondent and Fink is so conflicting as to make it impossible to determine what was said, respondent then knew that appellant was on the ranch ready to perform and that he had not performed up to that time. He did nothing to stop performance or to protect any rights which he might have claimed under the contract.

In *Auve v. Wenzlaff,* 162 Wash. 368, 298 Pac. 686, we said:

"There is no question but that respondents consented to the respective assignments. But respondents were never the moving parties. When they would demand money from the parties originally liable, they would then be referred to some other subsequent party. Respondents always insisted

that the payments be made as provided in the contract, and, of course, did not care who actually made the payments. Respondents' acquiescence in such assignments, unless they agreed to release the original parties, could not have the effect of nullifying the written contract.

"In a very early case, *Wooding v. Crain,* 10 Wash. 35, 38 Pac. 756, this court said:

" 'The second proposition of appellant, that the respondent could escape his liability by assigning his interest in the contract to a third party, cannot be sustained under any authority we know of. There is a vast difference between the rights of the assignee and the liability of the assignor under the original contract. The contracting party assumes certain obligations which the party with whom he has contracted has a right to enforce, and he certainly cannot escape these obligations by any assignment, and compel the original contractor to look to other parties than the parties' with whom he contracts. . . . and it would be a strange and novel principle of law that would compel him to look to an irresponsible person for the performance of a contract, and for the damages for its breach, when he had taken the precaution to contract with a responsible person.' "

We do not feel that the correspondence between the parties in June, 1948, showed an intention on appellant's part to relieve respondent of his obligation and look to Fink for payment. He merely stated that he did not care who paid for the work; but he most certainly did not release appellant.

Here the appellant discharged his obligation by performance in accordance with the terms of the agreement between the parties. The trial court found the charge for the work done to be reasonable.

No complaint was made by respondent that the performance was not timely. It is true the appellant promised to commence the work about January 20th, provided "we do not have too much extreme weather conditions." The testimony showed that due to frost conditions it would not have been expedient to have commenced the work sooner. Under the circumstances, there was not an unreasonable delay in the performance of the work.

The judgment is reversed, and remanded with directions to award judgment to appellant as prayed for in his complaint.

SIMPSON, C. J., BEALS, GRADY, and DONWORTH, JJ., concur.

[1]Reported in 221 P. (2d) 520.