[No. 65143-9-I.   Division One.   September 19, 2011.]

PETER NYE, *Individually and on Behalf of a Class of Similarly Situated Persons, Appellant,* v. THE UNIVERSITY OF WASHINGTON, *Respondent.*

*Frederick H. Gautschi III* and *George T. Hunter* (of *Connell Cordova Hunter & Gautschi PLLC*); and *Larry J. King*, for appellant.

*Louis D. Peterson, Mary E. Crego*, and *Michael J. Ewart* (of *Hillis Clark Martin & Peterson PS*), for respondent.

¶1 LEACH, A.C.J. — Peter Nye, representing a putative class of University of Washington faculty members, appeals a summary judgment order dismissing his breach of contract claim against the university. Nye contends the university breached its contractual obligation under the faculty salary policy to pay two percent merit raises to eligible faculty members during the 2009-2011 biennium. Because the university acted within its delegated authority in suspending the merit raises, we affirm.

## FACTS

¶2 This dispute concerns the interpretation of several provisions in the university handbook regarding faculty

salary.[1] The university's general salary policies and principles are set forth in sections 24-70 and 24-71 of the handbook. Section 24-70 provides for a merit raise for eligible faculty. It states in part,

A. Faculty at the University of Washington shall be salaried on a merit-based system that reflects the University's standing among its peer institutions. Under this system, all faculty deemed meritorious shall be regularly rewarded for their contributions to their department, school/college, and university. Resources permitting, the University shall provide its meritorious faculty with salaries commensurate with those of their peers elsewhere.

B. Advancement in salary can be effected in several distinct, but not mutually exclusive, ways. A salary increase:

1. shall be granted to provide an initial minimum equal-percentage salary increase to all faculty following a successful merit review.

¶3 Section 24-71 outlines the procedures for allocating resources for the salary increases provided in section 24-70. It reads,

A. The Provost shall consult with the Senate Committee on Planning and Budgeting and, each biennium, shall subsequently recommend to the President the allocation of available funds for salary increases, for distribution among all categories listed in Section 24-70.B. The President shall make the final decision on these allocations and shall report the decision to the Faculty Senate.

1. This allocation shall each year make available funds to provide an initial minimum equal-percentage salary increase to all faculty deemed meritorious.

¶4 In 2000, university President Richard McCormick issued executive order 64, titled "faculty salary policy," which was "designed to provide for a predictable and

---

[1] We note that these policies are now located in the university "policy directory." Because the issue here arose before this reconfiguration, we refer to the handbook throughout this opinion.

continuing salary progression for meritorious faculty." To achieve the goal of predictability, the policy mandated an annual two percent merit raise for eligible faculty. It stated, "All faculty shall be evaluated annually for merit and for progress towards reappointment, promotion and/or tenure, as appropriate. A faculty member who is deemed to be meritorious in performance shall be awarded a regular 2% merit salary increase at the beginning of the following academic year." The faculty salary policy, however, contains a "funding caution," which provides,

> This Faculty Salary Policy is based upon an underlying principle that new funds from legislative appropriations are required to keep the salary system in equilibrium. Career advancement can be rewarded and the current level of faculty positions sustained only if new funds are provided. Without the infusion of new money from the Legislature into the salary base, career advancement can only be rewarded at the expense of the size of the University faculty. Without the influx of new money or in the event of decreased State support, a reevaluation of this Faculty Salary Policy may prove necessary.

¶5 The legislature did not appropriate funds for university employee pay raises in 2002.[2] And although the faculty salary policy guaranteed raises for meritorious faculty, the university's board of regents did not provide pay raises for its faculty out of its internal funds. Nor did it amend executive order 64 or any other provision relating to merit raises. In response, Professor Duane Storti brought a class action alleging that the university had breached its contractual obligations under the faculty salary policy when it failed to pay merit increases to eligible faculty during the 2002-2003 academic year. The trial court granted Storti's motion for summary judgment, reasoning that while executive order 64 established the university right to "reevaluate" the policy, the university could not simply ignore the policy as it had done. Before the trial court entered final

---

[2] LAWS OF 2002, ch. 371, §§ 601(2)(a), (c), (f), 604.

judgment, the university settled with Storti and the class. After the Storti settlement, the university funded faculty merit raises through the 2008-2009 academic year.

¶6 In March 2009, because of a 12 percent budget reduction for the 2009-2011 biennium,[3] university President Mark Emmert found it necessary to reevaluate executive order 64. He and David Lovell, the chair of the university's faculty senate, appointed members of the faculty and the administration to a "Committee to Re-Evaluate Executive Order No. 64." The committee's review resulted in a proposed executive order, which Emmert forwarded to Lovell and Marcia Killien, the secretary of the faculty, to initiate review in the faculty senate. Lovell and Killien reported the results of the senate's review and proposed revisions to Emmert, most of which he incorporated into a final executive order.

¶7 Emmert issued that order—executive order 29—on March 31, and it was added to the handbook. The order suspended portions of executive order 64, including the two percent merit raise provision, as a way "to address the immediate financial circumstances facing the University." Executive order 29 reads in part,

Executive Order No. 64 recognized that in the event of decreased State support, a reevaluation of the Faculty Salary Policy could prove necessary. Unfortunately, we face that contingency to a degree that could not have been predicted even a year ago.

. . . In light of the economic circumstances facing the University, the following portions of Executive Order 64 must be and are immediately suspended:

. . . .

2. The sentence that reads, "A faculty member who is deemed to be meritorious in performance shall be awarded a regular 2% merit salary increase at the beginning of the following academic year."

---

[3] The university lost $214 million in state funding for its 2009-2011 biennium.

By its terms, the order expires at the conclusion of the 2009-2011 biennium.

¶8 On April 10, Lovell sent an e-mail to faculty members, including Peter Nye, alerting them to executive order 29's promulgation. Lovell attached a copy of the order to the e-mail.

¶9 During a meeting of the university's board of regents on April 16, the regents adopted a resolution endorsing executive order 29 and declaring that the order superseded conflicting provisions in the faculty handbook. A portion of the resolution reads,

> The Board of Regents:
>
> 1. Endorses the President's new Executive Order as a financial necessity and approves the suspension of merit pay increases through the 2009-11 biennium, which will prevail over any University policies, rules, or codes or regulations to the extent they may be inconsistent.

At the meeting, Lovell addressed the regents regarding executive order 29, characterizing the order as a joint effort between Emmert and the faculty senate. Lovell remarked, "[W]e believe the process—it's a cliché—but we believe that the process worked in this case. And appreciate the Regent's [sic] respect for that process."

¶10 Six months later, Nye, an associate professor of business administration at the university's Bothell campus, filed this lawsuit as a proposed class action.[4] The complaint alleged one cause of action—a breach of contract claim— and requested injunctive relief and money damages in the form of back pay. Specifically, Nye alleged that the university breached its contractual obligations under the faculty salary policy by suspending the two percent faculty merit raises for the 2009-2011 biennium.

¶11 In its amended answer, the university asserted that it had the authority to suspend the merit raises and

---

[4] Nye did not move to certify the putative class before moving for summary judgment.

pleaded several affirmative defenses, including the trial court's lack of subject matter jurisdiction, Nye's failure to comply with the Administrative Procedure Act,[5] and Nye's failure to exhaust his administrative remedies.

¶12 Both parties moved for summary judgment. After hearing the parties' arguments on March 5, 2010, the trial court entered an order granting the university's motion and dismissing Nye's. The trial court explained its reasoning:

> I am going to dismiss the case on the basis that the—there was a review by the faculty, this did result in an executive order, 29, which the Regents approved.
>
> . . . .
>
> . . . There's no genuine issue of material fact . . . , that is what they did and that legally they were permitted to do so.

¶13 Nye appeals.

## ANALYSIS

¶14 Nye argues that the trial court improperly granted summary judgment in favor of the university. We review summary judgment orders de novo.[6] Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[7] When reviewing a summary judgment order, we engage in the same inquiry as the trial court, considering the facts and all reasonable inferences from the facts in the light most favorable to the nonmoving party.[8]

¶15 The usual rules of contract interpretation govern interpretation of an employee contract.[9] Under the

---

[5] Ch. 34.05 RCW.

[6] *Hadley v. Maxwell*, 144 Wn.2d 306, 310, 27 P.3d 600 (2001).

[7] CR 56(c).

[8] *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002).

[9] *Kloss v. Honeywell, Inc.*, 77 Wn. App. 294, 298, 890 P.2d 480 (1995).

objective theory of contract interpretation, we must attempt to ascertain the intent of the parties from the ordinary meaning of the words within the contract.[10] Under the context rule, we may consider extrinsic evidence to determine the specific words and terms used, but not to show an intention independent of the instrument.[11] Extrinsic evidence includes the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties, and the reasonableness of the respective interpretations urged by the parties.[12]

¶16 Preliminarily, Nye asserts that the handbook and its faculty salary policy constitute a binding contract between the university and its employees. The university does not seriously dispute this assertion[13] but instead contends that the express terms of the handbook allowed for modification of the contract. We agree with the university.

¶17 The board of regents, the president, and the faculty oversee the affairs of the university as provided in chapter 28B.20 RCW and the handbook. Ultimate authority over the affairs of the university resides with the governor-appointed board of regents,[14] which has "full control of the university and its property."[15] Although the board has delegated some authority to the president and faculty, the board retains

the right of periodic review of any and all aspects of government of the University, the right to intervene and modify any rule, regulation, or executive order formulated by the President

---

[10] *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

[11] *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999).

[12] *Hearst*, 154 Wn.2d at 502.

[13] The university calls the handbook an "alleged contract" but devotes no argument to refuting Nye's handbook-as-contract claim.

[14] RCW 28B.20.100(1).

[15] RCW 28B.20.130(1).

or the faculty, the right to amend or rescind any existing rule, regulation, or executive order, and the right to enact such rules, regulations, and orders as it deems proper for the government of the University.[16]

¶18 The university faculty, consisting of the president and the professors, "shall have charge of the immediate government of the institution under such rules as may be prescribed by the board of regents."[17] The faculty handbook allows the president to promulgate executive orders using specified procedures:

Before an Executive Order is promulgated or revised by the President, it shall be reviewed by the Faculty Senate. . . . The President shall forward the proposed Executive Order (or revision) to the Faculty Senate Chair and to the Secretary of the Faculty, noting reviews that have taken place and requesting appropriate Faculty Senate review. The Faculty Senate Chair shall arrange a review and notify the President of the outcome of the review. . . . If revisions to the proposed order suggested by the Faculty Senate are not approved by the President, there shall be consultations with the Chair of the Faculty Senate to seek to resolve the differences. Following such consultations, the decision of the President is final.[18]

¶19 Here, Emmert submitted the proposed order to Killien and Lovell, who in turn forwarded it to the faculty senate. The faculty senate then reviewed the proposed order and made suggested revisions, which Emmert incorporated into the final version of executive order 29. The evidence in the record thus demonstrates that Emmert followed the procedures outlined in the handbook when he promulgated executive order 29.

¶20 Indeed, Nye conceded at oral argument that Emmert followed the proper procedures. But Nye contends that even with executive order 29 in place, the handbook

---

[16] Former university handbook § 12-12(A).

[17] RCW 28B.20.200.

[18] Former university handbook § 12-21(B)(1).

still entitled him to a merit raise because the order left the general faculty salary policy provisions in sections 24-70 and 24-71 intact. Nye asserts that only the faculty senate could have amended sections 24-70 and 24-71 through "Class A legislation." Nye is wrong.

¶21 In arguing that executive order 29 was insufficient to suspend the merit raises generally promised in sections 24-70 and 24-71, Nye overlooks the effect of the board of regents' resolution. The board exercised its ultimate authority over university affairs by expressly supporting executive order 29 and stating that it prevailed over any conflicting handbook provisions. Even if we assume that sections 24-70 and 24-71 conflict with executive order 29 and that executive order 29 alone was insufficient to suspend the merit raises, Nye's claim fails. Nye fails to explain how sections 24-70 and 24-71 survive the board's statement that executive order 29 prevails over contrary handbook sections. The board's resolution, which section 12-12 of the faculty handbook expressly authorized, precludes Nye's claim.

¶22 Nye argues instead that the board cannot exercise the authority reserved to it in section 12-12 of the faculty handbook. He asserts, without any citation to the record, that because the board had never before modified the handbook since it was adopted in 1956, the parties established an "implied contract" that negated section 12-12. We reject this argument.

¶23 First, we do not consider arguments unsupported by evidence in the record.[19] The record before us does not contain evidence of the modification history asserted by Nye. Second, even if the record did factually support Nye, our legislature has delegated to the board "full control" over the university. The handbook echoes this concept, stating, "Any authority delegated by the Board shall always be

---

[19] RAP 10.3(a)(5)-(6); *see also Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (argument unsupported by citation to the record or authority will not be considered).

subject to the ultimate authority of the Board."[20] The parties to a contract cannot avoid a statute through the inclusion of contrary contractual provisions.[21] Third, the case Nye relies upon, *Swanson v. Liquid Air Corp.*,[22] is factually inapposite. There, our Supreme Court stated that an employer's inconsistent representations and conduct may negate or override a disclaimer contained in an employee handbook. Here, section 12-12 is not a disclaimer; it is a contractual provision reserving statutory authority. The nonexercise of this authority for a period of time does not conflict with a claim that the board still retains it. *Swanson*, therefore, does not aid Nye.

¶24 Nye also contends that the handbook is a bilateral contract, which the president and board may not unilaterally amend. Even if Nye is correct, any distinction between bilateral and unilateral contracts makes no difference when the provisions of that contract allow for the modification that occurred. The handbook's express terms warn faculty that the provision of merit raises may be reevaluated, allow the president to issue executive orders, and state that the board may modify rules formulated by the president or faculty.

¶25 But Nye claims he justifiably relied on the promise of receiving a merit raise, citing the three-step test from *Korslund v. DynCorp Tri-Cities Services, Inc.*[23] That test applies in situations where no express employment contract between the parties exists; it is an equitable

---

[20] Former university handbook § 12-12(A).

[21] *See Failor's Pharmacy v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 499, 886 P.2d 147 (1994).

[22] 118 Wn.2d 512, 532-33, 826 P.2d 664 (1992).

[23] 156 Wn.2d 168, 184-85, 125 P.3d 119 (2005) ("The employee must prove these elements of the cause of action [for breach of a promise of specific treatment]: (1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached.").

doctrine "independent of a contractual analysis."[24] It does not apply where the parties, as here, have agreed that the provisions in an employee handbook constitute a contract.

¶26 Finally, Nye claims that he is entitled to the merit raise, characterizing the pay raise as "wages earned." We disagree.

¶27 Nye cites two cases in which our Supreme Court interpreted certain sections of two wage statutes.[25] In particular, those cases interpreted RCW 49.52.050 and RCW 49.52.070, which create civil liability[26] for an employer who "[w]ilfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract."[27] In interpreting these statutes, our Supreme Court held that an employer's financial status is not a valid defense to negate the finding of a willful failure to pay wages owed to employees.[28]

¶28 Those cases deal with denial of past wages earned, which distinguishes them from the situation here. A raise is an increase in future wage or salary. While often predicated on an employer's favorable evaluation of an employee's past work, as made explicit in the handbook (Nye must have received a favorable merit review to receive the raise), a raise compensates for the performance of future work. Here, before Nye performed that future work during the 2009-2010 academic year, the merit raise had been properly suspended by the university. Nye's argument is unpersuasive.

---

[24] *Korslund*, 156 Wn.2d at 185.

[25] *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 961 P.2d 371 (1998); *Morgan v. Kingen*, 166 Wn.2d 526, 210 P.3d 995 (2009).

[26] RCW 49.52.070.

[27] RCW 49.52.050(2).

[28] *Morgan*, 166 Wn.2d at 538.

¶29 In conclusion, the evidence in the record clearly demonstrates that the university acted pursuant to its statutory and contractual authority when it suspended the faculty merit raises. In his arguments to the contrary, Nye asks us to enforce some provisions of the handbook while overlooking others. We decline to do so.

*Attorney Fees*

¶30 Nye requests attorney fees on appeal. Because Nye is not the prevailing party, we deny his request.

## CONCLUSION

¶31 We affirm.

BECKER and SCHINDLER, JJ., concur.