28

[No. 88323-8.   En Banc.]
Argued January 21, 2014.     Decided July 24, 2014.

DUANE STORTI, *and a Class of Faculty Members, Petitioners,*
v. THE UNIVERSITY OF WASHINGTON, *Respondent.*

*Philip A. Talmadge* (of *Talmadge/Fitzpatrick PLLC*); and *Stephen K. Strong, David F. Stobaugh,* and *Stephen K. Festor* (of *Bendich Stobaugh & Strong PC*), for petitioner.

*Louis D. Peterson, Mary Eileen Crego Peterson,* and *Michael J. Ewart* (of *Hillis Clark Martin & Peterson PS*), for respondent.

*Mary D. Forsgaard* on behalf of American Association of University Professors, amicus curiae.

¶1 MADSEN, C.J. — At issue is whether a university may suspend an annual merit-based raise when the university's

promise warned faculty that the raise scheme may be reevaluated in response to changing financial conditions. Petitioners, a class of University of Washington (U.W. or the university) professors, allege that this suspension breached a unilateral contract they held with the university because the professors had substantially performed meritorious work in the year the policy was suspended and therefore were entitled to a raise in the following year. Alternatively, petitioners contend that res judicata requires entry of judgment in favor of the class in light of prior litigation involving a similar suspension in the 2002-2003 academic year. The Court of Appeals ruled for the U.W., reasoning that no breach of contract had occurred. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 The facts of this case center on a policy instituted by the U.W. in 2000 that awarded an annual two percent raise to all faculty who had performed meritoriously in the year prior. The U.W. introduced this policy to address concerns that they were focusing on acquiring faculty "stars" at the expense of retaining high-performing existing faculty. The U.W. president outlined the new policy in Executive Order (EO) 64, which was later incorporated into the university faculty handbook. Specifically, EO 64 provided:

> All faculty shall be evaluated annually for merit and for progress towards reappointment, promotion and/or tenure, as appropriate. A faculty member who is deemed to be meritorious in performance shall be awarded a regular 2% merit salary increase at the beginning of the following academic year. Higher levels of performance shall be recognized by higher levels of salary increases as permitted by available funding.

Clerk's Papers (CP) at 1242. The text of EO 64 also included a "Funding Cautions" provision, which outlined:

> This Faculty Salary Policy is based upon an underlying principle that new funds from legislative appropriations are required to keep the salary system in equilibrium. Career ad-

vancement can be rewarded and the current level of faculty positions sustained only if new funds are provided. Without the infusion of new money from the Legislature into the salary base, career advancement can only be rewarded at the expense of the size of the University faculty. Without the influx of new money or in the event of decreased State support, a reevaluation of this Faculty Salary Policy may prove necessary.

*Id.* at 1243.

¶3 The university has twice suspended this merit raise provision, both times prompting litigation. First, the university suspended the policy for the 2002-2003 academic year, which formed the basis for the litigation in *Storti v. University of Washington*, No. 04-2-16973-9 (King County Super. Ct., Wash. 2004) (*Storti* I). In that instance, the U.W. did not follow the applicable procedure but instead simply excluded the raises from its 2002-2003 budget when the legislature did not appropriate funds for the university to pay salary increases. Following the *Storti* I litigation, the university reinstated the salary policy until 2009, when it was again suspended. This second suspension forms the basis for the current *Storti v. University of Washington*, noted at 172 Wn. App. 1029, 2012 WL 6554827, at *3, 2012 Wash. App. LEXIS 2898, at *3 (*Storti* II) suit, as well as for related litigation in *Nye v. University of Washington*, 163 Wn. App. 875, 260 P.3d 1000 (2011). In contrast to the first suspension, this second suspension followed complex procedures. Faced with a deep recession and major budget cuts, the university president and the faculty senate chair appointed faculty and administrative personnel to a "Committee to Re-Evaluate Executive Order No. 64." CP at 1226. This committee, in turn, proposed and submitted to the faculty for review an EO suspending the merit raise. The faculty reviewed this proposed order and consulted with the university president about their proposed revisions. Then, on March 31, 2009, the university president issued EO 29, an order suspending the merit raise instituted in EO 64

until the conclusion of the 2009-2011 biennium.[1] Because several arguments stem from the related litigation that preceded *Storti* II, it is important to review the history.

¶4 The *Storti* I litigation concerned the identical faculty salary policy at issue here and involved the identical class representative, Professor Duane Storti. In *Storti* I, Professor Storti challenged the U.W.'s first suspension of the merit raise policy for the 2002-2003 academic year, alleging breach of contract. The class was defined as "[a]ll University of Washington faculty who worked in the 2001-02 academic year and the 2002-03 academic year, and who were not found unmeritorious for their service in the 2001-02 academic year." CP at 491. The superior court entered summary judgment for Storti based on the plain language of the faculty salary policy. The court did not consider whether the U.W. followed the proper process for "reevaluation" of the policy because the university simply withheld funds from the university budget. After summary judgment was granted, the parties entered into a settlement under which the U.W. reinstated its annual merit raise policy and agreed to pay $17.45 million in back pay, interest, and attorney fees to the faculty class.

¶5 In *Nye*, Professor Peter Nye challenged the university's 2009 suspension of the two percent merit increase policy, the same action that Professor Storti challenges here. Nye filed suit in October 2009 and never sought class certification. Professor Nye argued that the university's

---

[1] Specifically, EO 29 suspended four portions of EO 64:

1. The phrase "regular merit" in the first sentence of the subsection entitled *Allocation Categories*.
2. The sentence that reads, "A faculty member who is deemed to be meritorious in performance shall be awarded a regular 2% merit salary increase at the beginning of the following academic year."
3. The sentence that reads, "If deemed meritorious in the next year's review, the faculty member shall receive a regular 2% merit increase at the beginning of the following academic year."
4. The phrase, "In addition to regular merit salary allocations," in the sentence in the subsection entitled *Promotion*.

CP at 1244.

suspension breached a bilateral contract and that even if the U.W. did have the power to suspend the policy, it did not follow the proper procedure to do so. The superior court denied Nye's motion for summary judgment and entered summary judgment for the university. Nye appealed, but the Court of Appeals affirmed the trial court, reasoning that the express terms of the handbook policy allowed for modification of the merit raise provision and specified that executive orders are effective immediately when entered. *Nye*, 163 Wn. App. at 886.

¶6 In the current litigation Professor Storti challenges the same April 2009 suspension as did Professor Nye, but he raises different arguments. According to Storti, the university has the power to suspend the policy but cannot. do so retroactively by retracting its promise after faculty had substantially performed. This retroactive retraction, Storti argues, constitutes a breach of a unilateral contract between the university and the faculty. A proper "reevaluation" would have suspended the policy effective for the 2010-2011 academic year, 15 months after passage of EO 29. Here the class is defined as "[a]ll University of Washington faculty who served in the 2008-09 academic year and the 2009-10 year, and who were not found unmeritorious for their service in the 2008-09 academic year." CP at 1485. Storti seeks an award of back pay for lost wages stemming from the breach.

¶7 Storti filed his class action complaint in King County Superior Court on December 21, 2010. The superior court granted the U.W.'s motion for summary judgment on June 24, 2011. Storti then moved for direct appeal in this court, but we transferred the appeal to the Court of Appeals. Division One affirmed in an unpublished opinion. *Storti II*, 2012 WL 6554827, at *4-7, 2012 Wash. App. LEXIS 2898, at *18-21. The Court of Appeals reasoned that the suspension did not breach any contract because EO 29 was effective when signed, the funding cautions provision notified faculty that the policy could be modified, and contracts are

defined by specific language contained therein. The court also cited its earlier published decision in *Nye* as support for its holding. Finally, the court explained that res judicata did not apply because neither the evidence presented nor the facts relied on in *Storti* II were identical to those in *Storti* I. Storti petitioned for review, which we granted on June 6, 2013. *Storti v. Univ. of Wash.*, 177 Wn.2d 1015, 306 P.3d 960 (2013).

## DISCUSSION

*Standard of Review*

¶8 We review a trial court's summary judgment decision de novo. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is appropriate only where, viewing the facts in the light most favorable to the nonmoving party, there are no genuine issues of material fact and accordingly the moving party is entitled to judgment as a matter of law. CR 56(c). Here, we consider de novo whether the trial court erred by concluding that the U.W. had satisfied the CR 56(c) standard and was entitled to judgment as a matter of law.

*Unilateral Contract*

¶9 In any breach of contract action, the first question a reviewing court must answer is whether an enforceable contract has been created. Petitioners here urge that a unilateral contract was created when the university promised a raise for meritorious work and the faculty substantially performed. Because the contract requisites of offer, acceptance, and consideration are established, we find an enforceable unilateral contract.

¶10 Contracts come in two forms: bilateral and unilateral. The vast majority of contracts are bilateral, where two parties exchange reciprocal promises and one party's promise provides consideration for that of the other party. *Cook v. Johnson*, 37 Wn.2d 19, 23, 221 P.2d 525 (1950). In a

unilateral contract, however, only one party makes a promise. The second party may accept that promise and establish a unilateral contract only through performance of her end of the bargain. *Id.*

¶11 This court has recognized that employee handbook provisions may form the basis for unilateral contracts between employers and employees. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 228-29, 685 P.2d 1081 (1984) (reasoning that "an employee and employer can contractually obligate themselves concerning provisions found in an employee policy manual and thereby contractually modify the terminable at will relationship"); *cf. Govier v. N. Sound Bank*, 91 Wn. App. 493, 499-500, 957 P.2d 811 (1998) (showing the Court of Appeals' adoption of this concept); *Simon v. Riblet Tramway Co.*, 8 Wn. App. 289, 291-92, 505 P.2d 1291 (1973) (same). Even in this employment context, however, unilateral contracts are defined by traditional contract concepts of offer, acceptance, and consideration. *Thompson*, 102 Wn.2d at 228.

¶12 An offer must evidence an intent to be bound by the terms of a proposal. *See* RESTATEMENT (SECOND) OF CONTRACTS § 24 (AM. LAW INST. 1981). The U.W.'s institution of a merit raise policy in EO 64 unambiguously satisfies the requirements of an offer. EO 64 proclaimed that faculty "shall" undergo yearly evaluations and "shall" be awarded a two percent raise if found meritorious. CP at 1241-43. This language clearly shows the university's intent to be bound by its promise of annual raises for meritorious work.

¶13 The university's offer, moreover, was accepted by the faculty class.

¶14 As noted, unilateral contracts can be accepted only through performance and not by the making of a reciprocal promise. Petitioners contend that substantial, as opposed to full, performance is enough to constitute acceptance of a unilateral contract offer. Specifically, petitioners argue that because the faculty class had worked for most of the 2008-2009 academic year in reliance on the university's

promise of a raise in salary for the 2009-2010 academic year, they had substantially performed and thereby accepted the university's offer.

¶15 Pointing to our decision in *Navlet v. Port of Seattle*, 164 Wn.2d 818, 194 P.3d 221 (2008), petitioners urge that this court has adopted the substantial performance doctrine. But *Navlet* did not decide the issue presented in terms of unilateral contract. Indeed, this court has not yet considered whether substantial performance suffices for acceptance of a unilateral contract. However, petitioners correctly point out that the Court of Appeals addressed substantial performance in *Knight v. Seattle-First National Bank*, 22 Wn. App. 493, 498-99, 589 P.2d 1279 (1979). Relying on the *Restatement*, *Knight* held that the performance in that case was mere preparation, rather than substantial performance. *Id.* Under the *Restatement*, substantial performance by the offeree precludes withdrawal by the offeror. *Id.* at 496. The *Restatement* reasons that substantial performance in effect creates an option contract mandating that the offeror keep the offer open. RESTATEMENT § 45. Hence, substantial performance indirectly creates acceptance of the offer. Because it makes sense to recognize the reliance interest of an offeree who begins performance and because contract law in this state generally tracks national common law, we now adopt the *Restatement* approach articulated by the Court of Appeals in *Knight*. Accordingly, we find that the faculty class accepted the university's offer of a raise by their substantial and meritorious performance.

¶16 Finally, petitioners must identify consideration for the U.W.'s unilateral contract. Consideration exists in any bargained-for legal detriment, no matter how seemingly small. *See* RESTATEMENT § 71. Consideration thus may be established where employees continue in employment when they otherwise would not be required to do so. As long as the employees incur some legal detriment—by continuing to work, for example—the requirement of consideration

is met. This court has so held in the context of employer promises for bonuses. *Powell v. Republic Creosoting Co.*, 172 Wash. 155, 160, 19 P.2d 919 (1933); *Scott v. J.F. Duthie & Co.*, 125 Wash. 470, 472, 475, 216 P. 853 (1923). Although our prior cases concerned promises of a bonus rather than a promise of a raise, that difference is irrelevant to the question of consideration. Here, petitioners have established the requisite consideration by showing that the faculty class agreed to work for the entire year and not pursue positions elsewhere.

¶17 We hold that petitioners have established an enforceable unilateral contract based on the university's promise to extend raises for meritorious performance.

### Breach of Contract

¶18 Next, we must determine whether the suspension by the U.W. of its merit raise provision constituted a breach of this contract. It is a fundamental precept of contract law that contracts must be interpreted in accordance with all of their terms. *E.g.*, *Wagner v. Wagner*, 95 Wn.2d 94, 101-02, 621 P.2d 1279 (1980). Here, the terms of the contract included a funding cautions provision that warned faculty of potential "reevaluation" of the merit raise policy. Both parties agree that this language gives the university the power to alter or repeal the merit salary increase scheme, but they disagree on how that power must be effectuated. The crux of the issue, then, is the meaning of the word "reevaluate" as used in the funding cautions language.

¶19 Petitioners argue that "reevaluate" contemplates only prospective change to the policy and that the university's suspension after faculty had substantially performed constitutes a breach. Br. of Appellants at 25-26; Suppl. Br. of Pl. Faculty Class at 10-11. The university's suspension, they argue, could properly take effect only for the 2010-2011 year because the faculty had not yet begun meritorious performance in anticipation of a raise in that year.

¶20 This court gives contract terms their ordinary meaning where possible. *E.g.*, *Lawrence v. Nw. Cas. Co.*, 50 Wn.2d 282, 285, 311 P.2d 670 (1957). Although the term "reevaluate" indicates a procedural requirement, it does not connote the 15-month waiting period that petitioners advocate. *See Hearst*, 154 Wn.2d at 503. Moreover, the contract terms must be interpreted in light of the entire faculty handbook. Here, the university faculty handbook establishes a specific procedure for implementing executive orders and provides that these orders are effective when enacted. In particular, section 12-21(B) of the handbook outlines the president's power to issue executive orders, provides that a proposed order must be sent to the faculty senate for review, and mandates that the president consult with the faculty senate chair regarding proposed revisions. CP at 1234. Additionally, this provision explicitly states that executive orders "become effective on the day signed by the President." *Id*. The university followed this mandated procedure when it suspended the faculty merit raise scheme in 2009. The faculty were on notice of the potential for reevaluation, and the policy was properly reevaluated in accordance with the terms of the contract and the broader faculty handbook. Contrary to the dissent's suggestion, we do not credit the U.W.'s argument that the funding caution's language made the merit raise policy contingent on legislative funding. Dissent at 43-46. Instead, we hold that the term "reevaluate" must be interpreted in light of the entire faculty handbook, which specifies procedures for implementing and enforcing executive orders. Because the U.W. followed these procedures for reevaluation, its suspension of the merit raise policy did not breach its contract with faculty.

## Res Judicata

¶21 Petitioners argue that this court should not even reach the merits of contract formation and breach because the trial court granted summary judgment for the petition-

ers in *Storti* I, binding this court under principles of res judicata. In *Storti* I, a similar class of faculty challenged the U.W.'s suspension of the faculty merit raise policy for the 2002-2003 academic year. In ruling for Storti, the trial court reasoned that the faculty raise policy created a mandatory duty that was not contingent on legislative funding and the U.W.'s suspension without any "reevaluation" process constituted a breach. Petitioners here claim that *Storti* II "involves the same facts and same evidence as *Storti* I" because the U.W. breached the same duty to provide merit-based raises when it again suspended the policy in 2009. Suppl. Br. of Pl. Faculty Class at 18-20. Further, they argue that the court's ruling in *Storti* I applies here despite the fact that the university did not engage in any reevaluation process in 2002, pointing to the trial court's comment that " 'the court need not reach the question of what process would have been utilized to repeal, evaluate, or modify the Faculty Salary Policy.' " *Id.* at 19; CP at 776.

¶22 Res judicata—or claim preclusion—applies where a final judgment previously entered and a present action are so similar that the current claim should have been litigated in the former action. In this way, res judicata promotes judicial economy, efficiency, and fairness to litigants. This court has enumerated specific prerequisites to application of res judicata. Most relevant here, res judicata applies only where the current and prior case involve identical causes of action. *Schoeman v. N.Y. Life Ins. Co.*, 106 Wn.2d 855, 860, 726 P.2d 1 (1986). As the Court of Appeals correctly reasoned, this requires that the two cases involve substantially the same evidence and the same transactional nucleus of fact. *Storti* II, 2012 WL 6554827, at *7, 2012 Wash. App. LEXIS 2898, at *20 (citing *Kuhlman v. Thomas*, 78 Wn. App. 115, 122, 897 P.2d 365 (1995)). Here, neither the same evidence nor the same facts underlie *Storti* I and *Storti* II. *Storti* I concerned facts that transpired in 2002 and 2003, whereas *Storti* II involves events from 2009 and 2010. Specifically, in *Storti* I, the university

repealed the faculty raise policy without *any* process for reevaluation. In *Storti* II, the university complied with the requirement for reevaluation contained in the funding cautions provision as well as other provisions of the faculty handbook requiring use of a reevaluation procedure. Res judicata does not resolve this case.

## CONCLUSION

¶23 We hold that the university's promise of an annual two percent raise to meritorious faculty did create an enforceable unilateral contract. However, the university's 2009 suspension of that raise did not constitute a breach of that contract. Contracts are defined first and foremost by their terms, and the terms of this contract warned faculty that the policy could be reevaluated in response to changing economic conditions. Unlike in *Storti* I, here the university followed proper procedures to effect a reevaluation. There is no requirement that the university's policy change be delayed until the subsequent academic year. Finally, res judicata does not apply because *Storti* I and *Storti* II state different claims based on separate facts and evidence. The trial court properly granted summary judgment to the university. We affirm the Court of Appeals.

OWENS and FAIRHURST, JJ., and J.M. JOHNSON and SIDDOWAY, JJ. PRO TEM., concur.

¶24 GORDON McCLOUD, J. (dissenting) — I agree with the majority on several points. I agree that res judicata does not bar the University of Washington's (University) claims in this case. I agree that the members of the plaintiff class—University faculty whose performance in the 2008-2009 academic year was deemed meritorious—substantially performed their obligation under the merit pay contract at issue here (Executive Order 64 (EO 64)). I also agree with the majority, as do the plaintiffs, that the faculty were on notice that the merit pay policy could be reevaluated. And

I therefore agree that the primary question this case presents is what the term "reevaluation" means in the context of that policy. Majority at 39.

¶25 I disagree with the majority's answer to that question. The majority concludes that in EO 64's "Funding Cautions" provision, the term "reevaluation" really means *revocation*. *Id*. Because that conclusion is contrary to numerous well-settled principles of contract interpretation, I respectfully dissent.

## ANALYSIS

¶26 A court's primary task in interpreting a contract is to give effect to the parties' intent. *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996) (citing *Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 340, 738 P.2d 251 (1987)). To determine that intent, the court reads the contract as a whole, giving its terms their plain and ordinary meaning. *Dickson v. Hausman*, 68 Wn.2d 368, 370-71, 413 P.2d 378 (1966). Where terms in a contract are susceptible to more than one reasonable interpretation, extrinsic evidence is admissible to help resolve the ambiguity. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 502, 115 P.3d 262 (2005). Thus, we may look to the circumstances surrounding the formation of a contract, including the conduct of the parties, to determine which party advances the better of two reasonable interpretations. *Id*.

¶27 In this case, the parties agree that the Funding Cautions provision was intended to authorize prospective changes to the merit raise policy, because it "notified the faculty that a 2% raise was not guaranteed throughout their academic careers." Appellants' Reply Br. at 4; *see also* Suppl. Br. of Pl. Faculty Class at 10 ("The reevaluation provision makes it plain that the University is not making a career-long promise, and it retains the right to prospectively change the policy."). The University contends that

the provision was *also* intended to "allow[ ] the President to respond quickly to urgent situations, such as the budget cuts in this case," by effecting the immediate suspension of raises already earned through meritorious performance. Suppl. Br. of Resp't at 11.

¶28 The majority credits this argument with very little discussion.[2] It does not read EO 64 as a whole, and it does not address any of the circumstances surrounding the formation of the merit pay contract. Instead, the majority summarily concludes that the term " 'reevaluate' indicates a procedural requirement" and dismisses the faculty's position as reading in a term: specifically, a "15-month waiting period" before any merit raise cancellation could take effect. Majority at 39.

¶29 This strained interpretation misstates the faculty's position. The faculty does not argue that EO 64 requires the University to observe a "waiting period" before modifying terms in the merit pay contract. *Id.* Rather, it argues that the Funding Cautions provision authorized prospective changes to the merit pay policy but not the cancellation of raises already earned.

¶30 I dissent from the majority's decision because I conclude that the faculty advance the only reasonable interpretation of the Funding Cautions provision. I reach that conclusion for three reasons.

---

[2] The majority claims not to "credit the [University]'s argument that the Funding Cautions language made the merit raise policy contingent on legislative funding." Majority at 39. This is puzzling. There are only two possible interpretations of the ambiguous "funding cautions" provision at issue in this case. EO 64. According to the faculty, the Funding Cautions provision means that the merit raises are not guaranteed *forever*. According to the University and the majority, the provision means that the merit raises are *never* guaranteed—that they can be rescinded even *after* faculty members have earned them through substantial performance.

The University offers only one argument to support its (fairly extreme) interpretation: the argument that the Funding Cautions provision was intended to allow the University to respond *immediately* to shortfalls in legislative funding. According to the University, the faculty members knew that the merit raise contemplated this immediate response and therefore also knew that the merit raises were never truly guaranteed. If the majority does not credit this argument, it has no basis for rejecting the faculty's interpretation of EO 64.

¶31 First, the University's interpretation of the Funding Cautions provision is not consistent with EO 64 as a whole. The University contends that the Funding Cautions provision rendered the merit pay promise contingent on legislative appropriations. But EO 64, which is primarily a statement of salary-related priorities, explicitly distinguishes between salary increases that are mandatory, those that are discretionary, and those that are contingent on legislative appropriations. It makes *mandatory* the two percent raise following a year of meritorious performance while making other "allocations"—e.g., for promotions in rank and "to address differentials occurring in the academic labor markets"—merely discretionary. Clerk's Papers (CP) at 338 (EO 64, at 3). Most importantly, it provides that other "higher levels of salary increases [shall be awarded] *as permitted by available funding*." CP at 337 (EO 64, at 2) (emphasis added). Had the University intended to make the two percent merit raises contingent on legislative appropriations, it could easily have done so explicitly, as it did with respect to the "[h]igher level[ ]" increases. *Id.* The fact that the University specifically designated some raises as contingent on legislative appropriations indicates that it did *not* intend to make others similarly contingent. *See Burton v. Douglas County*, 65 Wn.2d 619, 622, 399 P.2d 68 (1965).

¶32 Second, the record contains no support for the theory that the merit raise promise was intended to be contingent. The University adopted the merit raise policy in response to a report by the "Ad Hoc Advisory Committee on Faculty Salaries" in 1998, which concluded that "[t]he low level of faculty salaries at the University of Washington" threatened the University's long-term survival:

> Many current [University] faculty members do not receive a salary sufficient to allow them to purchase a home in the Seattle metropolitan area. There is a widespread belief that an increasing number of [University] departments and colleges can no longer compete successfully to hire the best candidates

for faculty positions. These conditions are beginning to erode the quality and social fabric of a great university.

CP at 1160-61. To remedy that problem, the committee recommended that the University implement a system of regular merit evaluations and "opportunities for career advancement in salary for all faculty who are judged to be meritorious." CP at 1160. A faculty senate meeting "Bulletin" from April 1999 refers to the newly proposed faculty salary policy as "sustain[ing] a *predictable* and regular salary progression for meritorious faculty." CP at 288 (emphasis added).

¶33 When the University adopted the merit raise policy in January 2000, it made a number of statements to faculty that characterized the policy as a guarantee and specifically distinguished it from a mere aspiration contingent on legislative appropriations. A January 2000 letter from then President Richard McCormick described the policy as the University's "*commitment* to a 2% salary adjustment every year for faculty who are deemed meritorious." CP at 303 (emphasis added). The 2001 edition of the university handbook and the faculty code described the Faculty Salary Policy as the University's "commit[ment] to providing every faculty member whose performance is deemed meritorious with a 2% yearly increase." CP at 1195. It then stated that "[a]*dditional* levels of increase are dependent upon funding." *Id.* (emphasis added). By contrast, the University points to nothing in the record, other than the disputed Funding Cautions provision itself, which put faculty members on notice that their meritorious performance did not actually entitle them to a raise.

¶34 Finally, this court has previously rejected arguments similar to the University's. In *Carlstrom v. State*, 103 Wn.2d 391, 392-93, 694 P.2d 1 (1985), the Yakima Valley College Federation of Teachers (Federation) negotiated an agreement with the State according to which the teachers would receive a salary increase of about seven percent in each of the following two academic years. The agreement contained

a provision stating that it was " 'subject to all present and future acts of the legislature.' " *Id.* at 393. Halfway through the life of the agreement, the legislature passed a bill " 'defer[ring]' " appropriations for the salary increases until after the agreement expired. *Id.* The Federation sued, claiming the " 'deferral' . . . was in reality a cancellation of the contractual increase" that violated the state and federal constitutions' contract clause protections. *Id.* at 393-94.

¶35 This court agreed, reasoning that "[t]here is no doubt from the facts in this case that the State was fully aware how to make its contracts contingent on future acts of the Legislature" and concluding that it had not done so in the contract with the Federation. *Id.* at 394; *see also Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 406-07, 869 P.2d 28 (1994) (citing *Carlstrom*, 103 Wn.2d at 393-95, for the rule that if a state agency wishes to reserve the right to retroactively modify its contractual obligations in response to new legislation, it must do so *explicitly*).

¶36 Like the State in *Carlstrom*, the University here made a promise to its employees, decided that it did not want to keep that promise, and then argued that a vague contractual provision made that promise contingent. As in *Carlstrom*, the facts belie that argument.

## CONCLUSION

¶37 The University knew how to make a salary increase contingent on legislative appropriations—this is clear from the terms of EO 64 itself. With respect to the merit raise, it did not do so. Instead, it promised faculty members that meritorious performance would be rewarded with a raise in the following year. The plaintiffs in this case rendered meritorious service in reliance on that promise. They substantially performed their obligations under the merit pay

contract, and they are entitled to enforce it. I therefore dissent.

C. JOHNSON, STEPHENS, and GONZÁLEZ, JJ., concur with GORDON MCCLOUD, J.

Reconsideration denied October 10, 2014.