IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARK A. FRISBY,<br><br>      Appellant-Cross Respondent,<br><br>      v.<br><br>SEATTLE UNIVERSITY, a Washington non-profit corporation, and J.J., a single individual,<br><br>      Respondent-Cross Appellant, | No. 79321-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

LEACH, J. — Mark Frisby appeals an order of partial summary judgment and the order of dismissal that resulted in the dismissal of some of his claims against Seattle University with prejudice, and others without prejudice but barred by the statute of limitations. Seattle University appeals the denial of a motion for summary judgment. Frisby does not demonstrate any issue of material fact about his claim that Seattle University did not comply with Washington State law when it terminated him for cause. He also does not show the trial court abused its discretion when it dismissed his remaining claims without prejudice because he did not comply with the case scheduling order. And, this court generally does not review denials of summary judgment motions unless the request presents a pure question of law. So, we affirm.

FACTS

Seattle University (SU) hired Mark Frisby as head tennis coach in 2008. In

Citations and pincites are based on the Westlaw online version of the cited material.

2014, Frisby signed an employment agreement extending his contract to 2018. J.J. joined the women's tennis team on a scholarship in 2013.

Frisby also operated a tennis camp at Sun Valley Resort. He hired J.J. to work as a counselor at the camp in the summer of 2014. J.J. injured herself in the fall of 2013. After J.J. did poorly during the 2014 fall season, Frisby began warning J.J. that she risked losing her spot on the team.

On January 14, 2015, J.J. told the SU Athletic Department that Frisby engaged in incidents of sexual harassment and retaliation against her. On January 16, 2015, SU put Frisby on administrative leave while the school investigated the alleged misconduct. The athletic director, Bill Hogan, told Frisby he was relieved of his duties pending the investigation, and during that time, he was not to communicate with or coach student athletes.

The school appointed Andrea Katahira, its Human Resource Compliance and Deputy Title IX Coordinator, to conduct the investigation. Before working at SU, Katahira worked as an investigator for the State Human Rights Commission for three years, as an investigator for the Seattle Office of Civil Rights for less than one year, and at the University of Washington as an investigation/ resolution specialist for over 10 years. Her work with the University of Washington included investigation of sexual harassment accusations.

Katahira investigated whether Frisby's alleged acts of sexual harassment and retaliation violated the University's policy on sexual harassment as described

in its Human Resources Policy Manual (HR Manual).[1]  The manual stated,

> Sexual harassment…includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other behavior of a sexual nature when…[s]uch conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creates an intimidating, hostile, or offensive working or educational environment.

The manual described examples of "[c]onduct and behaviors prohibited by the University's Sexual Harassment Policy."

> A pattern of conduct (not legitimately related to the subject matter of a course) that causes discomfort or embarrassment, including
>
> - Verbal or written comments of a sexual nature;
> - Sexually explicit statements, questions, jokes, or anecdotes;
> - Touching, patting, hugging, brushing against a person's body, or repeated or unwanted staring;
> - Remarks about sexual activity, experience, or orientation;
> - Remarks of a sexual nature about an individual's body, clothing, or physical appearance…

The manual stated that retaliation was prohibited.

> Individuals who report a complaint of alleged sexual harassment may not be reprimanded or discriminated against in any way for initiating an inquiry or complaint in good faith. Further, the laws pertaining to sexual harassment make it unlawful to retaliate or to take reprisal in any way against anyone who has articulated a concern about sexual harassment or has participated or cooperated in the investigation of a complaint.

Katahira interviewed Frisby, Mark Hooper, the assistant head coach of the tennis teams, J.J., and

---

[1] According to Katahira's report, J.J. "brought forth allegations regarding the Assistant Head Coach of the Women's and Men's Tennis Teams." But, "[b]ecause the allegations overlapped and involved many of the same facts and witnesses, one investigation was conducted regarding both complaints."

10 employees within the Athletics Department, 1 employee in Human Resources, 8 (of the 8 remaining) student athletes on the Women's Tennis Team, 1 student athlete on the Men's Tennis Team, 1 former student athlete of the Women's Tennis Team, and 1 individual who worked with the Complainant and Respondent during the relevant time period.

She also reviewed "documentation provided by the Complainant and Respondent, [and] other relevant documentation obtained during the course of the investigation."

At her initial interview with Frisby on February 2, 2015, Katahira "reviewed the Complainant's allegations with him, and provided him the opportunity to respond." Katahira asked Frisby "to share anything else, not directly asked about, that he believed was relevant to the investigation or thought important for the investigator to know as part of the investigation." She also said he could ask questions. They met again on March 5, and Katahira gave Frisby "the opportunity to respond to additional information obtained during the course of the investigation, as well as the opportunity to provide any additional information and clarification." Frisby took notes at these meetings.

According to Frisby, he and his counsel were told absolutely nothing about the specifics of what was alleged.

> Eventually I was told-during my interview-that the allegation involved misconduct in Sun Valley but I was given no date, no time, no place. I was prohibited from having my attorney present at my interview with the investigator. I was given no discovery materials, investigation materials, witness statements or anything else during the process. After inquiry my lawyer was told there would be no hearing, no witnesses at a hearing, no cross examination, no tribunal and no fact finder.

After completing her investigation, Katahira wrote a report summarizing her findings and conclusions. Katahira investigated four categories of behavior relating to J.J.'s sexual harassment allegations. She found, that more likely than not, Frisby engaged in three of the four.

First, she found J.J.'s assertion credible that Frisby made repeated comments about J.J. "loving boys" and/or "knowing a lot of boys" during the 2013 and 2014 academic year. She based this finding "on credible accounts of multiple witnesses… [the] overall credibility of [J.J.] and overall lack of credibility of Mr. Frisby."

She also found it was more likely than not that Frisby made comments about J.J.'s appearance on two separate occasions, and in one instance, made intimate physical contact of a sexual nature with her in the summer of 2014 when she was employed as a camp counselor. She based this finding on J.J.'s credibility and Frisby's lack of credibility.

Finally, Katahira found it was more likely than not J.J. told "Frisby she was 'uncomfortable with his way towards her,' and told him not to make further comments related to boys, her boyfriend, or her appearance, and not to 'touch [her] in that way' again." She based this on J.J.'s credibility, the lead camp counselor's statement that J.J. told Frisby to stop, and Frisby's lack of credibility.

Katahira found insufficient support for J.J.'s claim that Frisby "encouraged relationships between the camp counselors and older, male Sun Valley clients specifically, including Tony."

Katahira concluded that, more likely than not, Frisby engaged in

inappropriate actions toward J.J. that were "unwelcome…undesirable and offensive [and their] impact created an intimidating and hostile environment." As a result, Frisby violated SU's nondiscrimination and sexual harassment policies.

She found insufficient evidence to support the claim that Frisby engaged in retaliation. She concluded that his suggestion that J.J. would not remain on the team were consistent with concerns about her level of commitment, lack of demonstrated effort, "lack of putting in 'extra time'", and Frisby's concerns about her physical condition. She based this conclusion, in part, on the witness support for the concerns raised by Frisby. But, she concluded that given the context, it was reasonable for J.J. to perceive Frisby's warnings as retaliatory.

Katahira also investigated whether Frisby's actions while on administrative leave constituted insubordination. She found the university provided clear written and verbal notice of the prohibition on contacting student athletes during Frisby's administrative leave. She found it more likely than not that Frisby engaged in four types of insubordinate actions. First, he placed a team travel list on his office door the day after he was placed on leave. Second, he was involved with text communications sent by his wife to student athletes. Third, he was involved in the placement of a second travel list on the door and the addition of another player to the "away" roster, and he more likely than not "played a role" in this new student being added to the Boise trip. Finally, he communicated with a coach from another university about an upcoming match. She concluded these actions "all of which took place after his notification of the original complaint and placement on paid administrative leave" demonstrated that "Frisby failed to adhere to the University's

6

direction." He "willfully disregarded" Hogan's instructions and "compromised the integrity of the investigation." She concluded that Frisby engaged in insubordination.

After reviewing the file and meeting the athletic director, vice president of SU, and the human resources manager collectively, determined that Frisby violated SU's nondiscrimination and sexual harassment policies through his conduct toward J.J., and he had willfully disregarded the directive to refrain from coaching or communicating with students while on administrative leave. Hogan decided to terminate Frisby because each violation alone was a serious act of misconduct that justified termination under the employment agreement.

In his letter terminating Frisby's employment, Hogan summarized Katahira's conclusion that more likely than not Frisby's actions "created an intimidating and hostile educational environment for J[.]J[.] based on sex, and thus, limited her ability to participate in and receive benefits and opportunities in the University's tennis program." Based on this, he concluded Frisby's "conduct is a violation of the University's Nondiscrimination and Sexual Harassment policies and [Frisby's] Department of Athletics Head Coach Employment Contract." Hogan's letter also summarized the report's finding that Frisby's actions during the investigation willfully disregarded [the] directive to [him] upon notification; compromised the integrity of the investigation; potentially influenced witnesses; complicated and lengthened the investigation; and could reasonably be viewed as retaliatory toward J[.]J." Because of this, Hogan concluded that this conduct was "insubordinate" and "a violation of university policy and [Frisby's] Department of Athletics Head

7

Coach Employment Contract."

In his letter, Hogan stated that in his "judgment that [Frisby's] actions [were] a material breach of [his] Employment Contract and constitute[d] 'cause' for termination under Sections 7(a)(c)(d) and (e) of that agreement." According to Hogan's letter, Frisby's "actions in violation of the university's Sexual Harassment Policy" and his "conduct after being notified of the complaint [were] serious acts of misconduct. [They] were not reflective of the moral and ethical standards that are expected of a Head Coach at Seattle University."

Frisby appealed to the provost. The provost gave Frisby the opportunity to meet so he could provide the provost with any additional information he wanted considered. Frisby's attorney declined. The provost upheld the termination decision and it became effective on May 14, 2015.

On April 3, 2017, Frisby filed a complaint against SU for breach of contract based on the employment agreement and breach of promises of specific treatment based on the sexual harassment investigation procedure described in the HR Manual. SU moved for summary judgment. The trial court granted Frisby's motion to continue SU's motion for summary judgment.

On October 24, 2018, the trial court granted SU's motion for summary judgment as to Frisby's breach of contract and wrongful withholding of wages claim. It found no genuine issue of material fact or legal insufficiency of the evidence for the following for cause elements: arbitrary, capricious, or illegal reason, adequate investigation, substantial evidence, or a basis reasonably believed to be true. But, the court denied SU summary judgment on the issue of

8

the HR Manual. It concluded that, as a matter of law, SU was required to comply with the procedure described in the HR Manual for handling sexual harassment and sexual misconduct complaints when it pursued termination for cause. Because the court found a genuine issue of material fact about whether SU complied with the manual's procedure, and whether SU breached a promise for specific treatment in specific situations, it denied summary judgment on that issue.

On October 29, 2018, SU submitted a letter asking the trial court to waive the alternative dispute resolution (ADR) requirement in its case scheduling order and allow the case to proceed to trial because Frisby never provided SU with a written settlement demand required by the scheduling order and needed for ADR. That same day, the court sent an email to counsel reminding them that the case was noncompliant with the court's case scheduling order and was not being prepared for trial, and it was at risk of dismissal on the scheduled trial date in two weeks.

Frisby asked for CR 54(b) certification or, in the alternative, for reconsideration of its summary judgment decision. The trial court denied both. On November 13, 2018, the trial court dismissed the case without prejudice because the parties had not complied with the case scheduling order.

Both Frisby and SU appealed. Frisby asked this court to consider his appeal because the statute of limitations barred refiling his claims dismissed without prejudice. A commissioner of this court decided that he properly appealed under RAP 2.2(a)(1) and/ or RAP 2.2(a)(3).

## STANDARD OF REVIEW

This court reviews summary judgment orders de novo.[2] Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[3]

This court reviews a trial court's order dismissing a case and imposing terms for noncompliance with court orders for abuse of discretion.[4] A court abuses its discretion when it makes a manifestly unreasonable decision or bases it on untenable grounds or reasons.[5]

## ANALYSIS

Frisby claims the trial court should not have dismissed his claim that SU lacked adequate cause to fire him. Frisby also contends the trial court should not have dismissed his remaining claims without prejudice because the parties failed to comply with a scheduling order. SU contends the trial court should have dismissed with prejudice Frisby's claim that SU did not follow its HR Policy Manual.

Discharge for Cause

Frisby contends the record shows a genuine issue of material fact about whether SU improperly dismissed him for cause.

---

[2] Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 327, 364 P.3d 129 (2015).
[3] Life Designs Ranch Inc., 191 Wn. App. at 327.
[4] Apostolis v. City of Seattle, 101 Wn. App. 300, 303, 3 P.3d 198 (2000).
[5] State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

Frisby's employment agreement governed his termination. "The usual rules of contract interpretation govern interpretation of an employee contract."[6] Frisby's agreement required the University have cause to fire Frisby. "Cause" under section 7 of the employment agreement included the following.

> (a) A material breach, as determined by the University, of this Agreement by Employee;

> (c) Any serious act of misconduct by Employee, including but not limited to, a felony or other unlawful conduct, fraud, dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or any act injuring, abusing, or endangering others;

> (d) Any act that, in the sole good faith judgment of the University, brings Employee or the University into public disrepute, contempt, embarrassment, scandal, or ridicule, or that negatively impacts the reputation or high moral or ethical standards of the University;

> (e) Violation of any law, policy, rule, regulation, constitutional provision, bylaw or interpretation thereof of the University . . . which violation may, in the sole good faith judgment of the University, reflect adversely upon the University or its athletic program…

According to the agreement, "'Cause' sufficient to satisfy the provisions of this section shall be determined by the Director or University President or his designee."

The contract gave SU the authority to determine cause. The evidence before SU at the time it fired Frisby included Katahira's report and the documentation and interviews she used in her analysis.

Katahira concluded that, more likely than not, Frisby engaged in inappropriate actions toward J.J. that were "unwelcome…undesirable and offensive [and their] impact created an intimidating and hostile educational

---

[6] Nye v. University of Washington, 163 Wn. App. 875, 882, 260 P.3d 1000, (2011).

environment." She concluded that Frisby violated SU's nondiscrimination and sexual harassment policies.

Katahira also found Frisby's actions that "took place after his notification of the original complaint and placement on paid administrative leave" demonstrated that "Frisby failed to adhere to the University's direction," "willfully disregarded" Hogan's instructions and "compromised the integrity of the investigation." She concluded that Frisby engaged in insubordination.

At a minimum, Katahira's findings supported SU's determination that Frisby committed insubordination under section 7(c) of the contract. Because the University determines what constitutes a material breach of the employment agreement, and the Director and the Provost concluded that Frisby's actions constituted a material breach, SU's decision to terminate Frisby for cause met the requirements of section 7(a) of the employment contract.[7]

Frisby asserts that SU's decision was unlawful, arbitrary and capricious, unsupported by substantial evidence and not based on SU's reasonable belief that Frisby's actions created cause for his dismissal.

Washington State courts review an employer's termination of an employee for cause to ensure that the employer acted based upon a "fair and honest cause

---

[7] SU terminated Frisby for cause based on its conclusion that his actions triggered Sections 7 (a)(c)(d) and (e) of the employment agreement.

or reason, regulated by good faith."[8]  Under Baldwin,[9] "a discharge for 'just cause' is one which is not for any arbitrary, capricious, or illegal reason and which is based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true."  This analysis applies to contracts that include specific grounds for dismissal.[10]  "[T]he issue is whether at the time plaintiff was dismissed defendant reasonably, in good faith, and based on substantial evidence believed plaintiff had done so."[11]

SU relied upon Katahira's report to determine that cause existed to fire Frisby.  Katahira's determination of insubordination relied upon witness testimony and documents identifying multiple actions by Frisby where he "contacted" and "coached" students via his wife in violation of SU's directive against this behavior during administrative leave.  This report provided substantial evidence of "just cause" that SU reasonably relied upon.  SU did not fire Frisby based upon an arbitrary, capricious, or illegal reason.[12]  SU complied with Washington State law and the employment agreement when it terminated Frisby for cause.

Frisby asserts the contract did not give SU sole discretion to terminate his employment.  But, the contract provided "'Cause' sufficient to satisfy the provisions

---

[8] Baldwin v. Sisters of Providence in Washington, Inc., 112 Wn.2d 127, 139, 769 P.2d 298 (1989). SU contends this court should not follow Baldwin, because this case involves a private employment agreement between Frisby and the school and not an implied contract under an employee handbook.  But, it cites to no cases suggesting the Baldwin standard does not apply in cases with express written agreements defining cause for termination.

[9] 112 Wn.2d at 139.

[10] Gaglidari v. Denny's Restaurants, Inc., 117 Wn.2d 426, 438, 815 P.2d 1362 (1991).

[11] Gaglidari, 117 Wn.2d at 438.

[12] Because insubordination alone is sufficient to support SU's decision, we do not analyze its alternative basis for firing Frisby.

of [Section 7] shall be determined by the Director or University President or his designee." So, Frisby's argument fails.

Frisby also contends that Washington State law does not allow an employer to retain sole discretion to determine whether cause exists for termination. He claims that SU was required to exercise its authority "consistent with Frisby's reasonable expectations." He asserts the athletic director's letter telling Frisby not to contact players was not a "rule" and he could not reasonably anticipate his actions during the administrative leave would result in termination of his employment. We disagree.

The athletic director's letter provided clear instructions to Frisby. His employment contract included insubordination as a cause for termination. Undisputed evidence shows he did not follow the athletic director's written instructions. So, he could reasonably anticipate that not complying with his employer's direction could result in his termination for cause.

Frisby also asserts that SU relied on an inadequate investigation that it could not in good faith rely upon to terminate him for cause. To discharge its duty of good faith, "the employer should conduct an objectively reasonable investigation to ascertain the facts"[13] before firing an employee for cause.

SU hired Katahira to conduct the investigation. Katahira had experience in conducting this type of investigation. She interviewed J.J., Frisby and many other witnesses. She provided Frisby the opportunity to respond to other witness testimony. She analyzed documentary evidence, such as texts between Frisby's

---

[13] Gaglidari, 117 Wn.2d at 459.

wife and the players, and evidence Frisby provided regarding the flipping-off motorists incident. Katahira described the evidence, drew findings, and explained her conclusions. She explicitly weighed the credibility of Frisby and J.J. and based her conclusion on reasons identified in the report. Frisby fails to show any genuine issue of fact about the sufficiency of the investigation.

Frisby provides the following reasons for why the investigation was insufficient.

- The investigator failed to obtain evidence concerning the extent of the financial impact that J[.]J[.]'s removal from the team would have on her.
- The investigator considered all evidence of J[.]J[.]'s powerful motive for fabrication to be irrelevant.
- The investigator considered all evidence of Frisby's fifty year history of good character, integrity and upright behavior to be irrelevant.
- The investigator failed to pursue information concerning J[.]J[.]'s history of deceit and manipulative behavior, and then gave no weight to the evidence that she did obtain.
- When interviewing other team members, the investigator wanted to hear nothing about J[.]J[.]'s background and the team members' experience with her in Sun Valley... Instead, it appeared…that "the investigator had her mind made up." … conclusion about [another] interview with the investigator was similar. "The investigator was clearly biased against Coach Frisby."
- In determining that Frisby had committed "insubordination," investigator unreasonably exaggerated the significance of the communications with team members, and failed to consider the circumstances that made those communications necessary.

These assertions rely upon conclusory statements by Frisby and the team members, and for most of them, Frisby fails to cite to the record. Conclusory facts

15

presented by the nonmoving party will not defeat summary judgment.[14] And, an appellant must include reference to the record for each factual statement he makes.[15] Frisby's assertions do not establish any issue of material fact.[16]

<u>HR Manual</u>

SU asserts that the trial court erred in denying SU's motion for summary judgment on Frisby's claim that the school owed him specific treatment in specific situations through the HR Manual's sexual harassment procedure. This court normally does not review a denial of a request for summary judgment when the trial court finds disputed issues of material fact.[17] Here, the trial court found there were disputed issues of fact. So, we decline to review this issue.

<u>Dismissal for Failure to Comply with Court Order</u>

Frisby also challenges the trial court's dismissal of his remaining claims for failure to follow a scheduling order.

KCLR 4(g)(1) states, "Failure to comply with the Case Schedule may be grounds for imposition of sanctions, including dismissal, or terms." KCLR 16(b) also required the parties in this case to "participate in a settlement conference or other alternative dispute resolution process conducted by a neutral third party."

---

[14] <u>Grimwood v. Univ. of Puget Sound, Inc.</u>, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988), abrogated on other grounds by <u>Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County</u>, 189 Wn.2d 516, 528, 532, 404 P.3d 464 (2017).

[15] RAP 10.3(a)(6); <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[16] Frisby claims SU violated GR 14.1. But, he does not explain why he expects this court to reprimand parties for these citations in their briefing.

[17] <u>City of Redmond v. Hartford Accident & Indem. Ins. Co.</u>, 88 Wn. App. 1, 667, 943 P.2d 665 (1997).

That did not happen in this case. When a party disregards a court's order "without reasonable excuse or justification" the act "is deemed willful."[18]

The trial court warned the parties on October 24, 2018 that if they did not comply with the ADR requirement in the scheduling order, or obtain a waiver of the requirement from the court, the case was out of compliance with the case scheduling order. On October 29, 2018, the trial court sent the parties a "final reminder" that the case was noncompliant with its scheduling order, was not being prepared for trial, and under KCLR 4(g) and KCLR 16(b)(4) was at risk of dismissal on November 13, 2018, which was the date scheduled for trial. On November 13, the trial court dismissed the case without prejudice under KCLR 4(g).

The record makes clear the court reminded the parties twice they had not complied with the scheduling order's ADR requirement. And, Frisby does not dispute that he failed to provide SU with the written settlement demand required by the order and needed for mediation. He does not dispute the court warned the parties it might dismiss the case because they had not complied with the scheduling order.

Frisby suggests "the record evidences no weighing or consideration of any kind by the trial court before entry of the dismissal order." But, the record establishes the trial court warned the parties twice they had not complied with its order. Frisby also asserts that the trial court was required to make written findings. But, the record is sufficient for this court to review the trial court's decision. Frisby does not suggest otherwise.

---

[18] Rivers v. Wash. State Conference of Mason Contractors, 145 Wn.2d 674, 698, 41 P.3d 1175 (2002).

Frisby also assigns error to the trial court's denial of his motion for reconsideration and his motion for certification under CR 54(b). But, he fails to provide an argument to support these challenges, so we do not address them.[19]

CONCLUSION

We affirm. Frisby does not establish any genuine issue of material fact about his claim that SU did not comply with Washington State law when it terminated him for cause. Frisby also fails to establish the trial court abused its discretion by dismissing his remaining claims without prejudice for failure to comply with its scheduling order after repeated reminders of the consequences of noncompliance.

_Leach, J._

WE CONCUR:

_Dwyer, J._

---

[19] Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 385 (2011).

18