# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3251

_____

Sheet Metal Workers Local No. 2

*Plaintiff - Appellant*

v.

Silgan Containers Manufacturing Corp.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: April 17, 2012
Filed: August 28, 2012

_____

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

MELLOY, Circuit Judge.

Sheet Metal Workers Local No. 2 ("the Union") attempted to commence arbitration of terminated employee Joshua Stracener's grievance. Before arbitration proceedings commenced, Stracener died, and the employer, Silgan Manufacturing Corp. ("Silgan"), refused to proceed with arbitration. The Union brought this suit to compel arbitration. Upon cross-motions for judgment on the pleadings, the district court found Silgan did not agree to arbitrate claims of a deceased employee and

dismissed the case. We reverse, holding that the parties agreed to mandatory arbitration of Stracener's claim, and no legal principle deprives the Union of power to enforce that agreement.

I

The Union is the exclusive bargaining representative for workers at Silgan. The Collective Bargaining Agreement ("the CBA") between the Union and Silgan includes a grievance procedure for "any grievance that may arise between the company and any of its employees." Under this provision, employees may file a grievance against their supervisor or shop steward. If the employee and his or her supervisor do not resolve a grievance in the first instance, the CBA sets out a procedure for the Union to process the grievance further, if it so chooses. Any grievance that the Union and Silgan do not initially resolve "may be submitted to arbitration."

The CBA also provides a procedure for employees to protest their discharge. An employee wishing to protest "must file his protest in writing with the Union within seven (7) calendar days of discharge." The Union and Silgan are then to discuss the "merits of the case," and if they find the employee was wrongfully discharged, Silgan must reinstate the employee and compensate him or her for time lost at the regular rate of pay.

On February 3, 2010, Stracener, a member of the bargaining unit, was discharged under § 29.1 of the CBA, which provides that "[a]n employee may be discharged for dishonesty, intoxication, or other just cause." Pursuant to the CBA's grievance procedure, the Union first protested the discharge on Stracener's behalf, then it filed a grievance, seeking reinstatement and compensation for lost wages.

When this initial grievance failed to resolve the dispute, the Union made a demand for arbitration. In accordance with the CBA, Silgan and the Union mutually selected an arbitrator and scheduled an initial hearing for November 17, 2010. However, on November 12, 2010, Stracener was killed in a car accident.

Following Stracener's death, the scheduled hearing did not occur. The Union attempted to reschedule the arbitration, but Silgan refused to proceed with the hearing, arguing that Stracener's death removed the dispute from the CBA's mandatory arbitration provision. The Union then brought this suit, seeking to compel arbitration, and the parties filed cross-motions for judgment on the pleadings. The district court found for Silgan, holding that the CBA did not mandate arbitration of grievances where the employee at issue has died, because deceased people are not included in the definition of "employee" in the CBA. The Union now appeals that decision to this court.

II

"We review a district court's grant of judgment on the pleadings de novo." Minch Family LLLP v. Buffalo-Red River Watershed Dist., 628 F.3d 960, 965 (8th Cir. 2010) (internal quotation marks omitted). We also review de novo a district court's interpretation of a contract's arbitration provision. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 1 v. GKN Aerospace N. Am., Inc., 431 F.3d 624, 627 (8th Cir. 2005). When considering arbitration agreements in CBAs, we are particularly mindful of repeated instructions to interpret arbitration agreements broadly, in light of a general national policy favoring that method of dispute resolution. See United Steelworkers of Am., AFL-CIO-CLC, Local No. 164 v. Titan Tire Corp., 204 F.3d 858, 861 (8th Cir. 2000) ("The presumption of arbitrability prevails when an arbitration clause contains no clear, exclusionary language."); Kan. City Royals Baseball Corp v. Major League Baseball Players Ass'n., 532 F.2d 615, 620 (8th Cir. 1976) ("In resolving questions of arbitrability, the courts are guided by Congress's

declaration of policy that arbitration is the desirable method for settling labor disputes. Accordingly, a grievance arising under a collective bargaining agreement providing for arbitration must be deemed arbitrable unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (internal quotation marks and citation omitted)).

We hold that the arbitration provision in the CBA between the Union and Silgan mandated arbitration of Stracener's grievance. The fact that Stracener died after being discharged, but before arbitration of his claim commenced, does not alter our conclusion. In reaching this holding, we must address two issues. First, we consider whether the parties agreed to arbitrate Stracener's claim, and we determine that they did. Second, we consider whether any other principle of law brings Stracener's claim outside the mandatory arbitration provision of the CBA, and answer that question in the negative.

A

As the district court found, the CBA's protections are limited to "employees." With the exception of "matters that the parties specifically exclude, all of the questions on which the parties disagree . . . come within the scope of the grievance and arbitration provisions of the collective agreement." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581 (1960). Here, the CBA in general, and the grievance section in particular, refer exclusively to matters between "employees" and the Company. Although Article 32, which covers arbitration, does not specifically refer to "employees," it sets out the procedure for arbitration of "grievances," which the CBA defines as between employees and the company. Thus, the CBA's general limitation to employees is incorporated by reference in Article 32. The CBA's grievance provisions apply to the resolution of grievances that arise in the scope of a covered employee's employment. See CBA § 31.1 ("[A]ny grievance that

-4-

may arise between the Company and any of its employees shall be taken up in the following manner."); id. at § 32.1 ("Any dispute or grievance arising as to the meaning or interpretation of this Agreement that cannot be settled in Step #3 of the grievance procedure may be submitted to arbitration.").

There is no indication in the CBA that this mandatory arbitration provision ceases to apply when employees die after their grievances arise but before arbitration of those grievances commence. The CBA contains no explicit provision that excludes from mandatory arbitration claims of employees who die before arbitration proceedings begin. Neither does it implicitly exclude these claims. For example, the CBA provides for both equitable and monetary damages: employees may recover damages both in the form of reinstatement and compensation for lost wages. Neither the CBA nor Missouri law in general provides a reason such compensation could not flow to a deceased employee's estate. See Aufenkamp v. Grabill, 112 S.W.3d 455, 460 (Mo. Ct. App. 2003) ("Generally, when a party to a contract dies and the contract is not one of a personal nature, the decedent's interest or obligation under the contract passes to the personal representative.").

Silgan argues that, since the decedent's estate was not a signatory to the arbitration agreement, the agreement does not bind the estate, and the estate may thus choose to pursue its claim outside of mandatory arbitration. This argument rests on a flawed premise. The decedent's estate stands in the decedent's shoes and has the same rights and obligations as the decedent did while he was alive. Johnson v. Great Heritage Life Ins. Co., 490 S.W.2d 686, 691 (Mo. Ct. App. 1973) ("As administratrix of the deceased debtor the appellant stands in the shoes of her decedent, and therefore has a right under the contract as alleged to require performance by the insuror to retire the debt she avers is still outstanding."); Engelsmann v. Holekamp, 402 S.W.2d 382, 390 (Mo. 1966) (noting that an executor of an estate stands in the shoes of a deceased trustee "insofar as the duty and obligation to render an account is concerned"). Thus,

just as an employee must submit to mandatory arbitration in life, so to must the estate of that employee after his or her death.[1]

Silgan's reliance on the Supreme Court case, Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157 (1971), to hold that deceased employees are excluded from the definition of employee in the CBA is also misplaced. In Pittsburgh Plate Glass, the Supreme Court held that it is not an unfair labor practice for employers to refuse to bargain with employees who have "ceased work without expectation of further employment" because those people are no longer employees. Id. at 168. In reaching this conclusion, the Court noted that "there is no anomaly in the conclusion that retired workers are 'employees' within § 302(c)(5) [of the Labor Management Relations Act] entitled to the benefits negotiated while they were active employees, but are not 'employees' whose ongoing benefits are embraced by the bargaining obligation of § 8(a)(5)." Id. at 170. The Court further observed that the retirees "plainly do not share a community of interests broad enough to justify inclusion of the retirees in the bargaining unit." Id. at 173.

Unlike the interests of retirees the Supreme Court considered in Pittsburgh Plate Glass, the interests of employees whose grievances arise in the course of their employment, but who die before those grievances are resolved, do not diverge from the interests of current employees. In Pittsburgh Plate Glass, the issue was the employer's continuing obligation to *negotiate* with former employees over future

---

[1]Silgan points to a Missouri statute that empowers executors of estates to "[r]eceive assets from fiduciaries or other sources" to argue that the estate would not be bound by the result in the arbitration proceeding. See Mo. Rev. Stat. § 473.810(2). This reading is too broad. The language of the statute does not suggest that the estate has any greater contractual rights than the decedent did while alive, nor do Missouri cases suggest as much. See Johnson, 490 S.W.2d at 691; Engelsmann, 402 S.W.2d at 390. There is thus no indication that Missouri courts would find the CBA's mandatory arbitration provision not binding on Stracener's estate.

benefits. But here, the issue is the employer's continuing obligation to *resolve disputes* with former employees over an issue that occurred during the employee's employment. The two situations are clearly different: one imposes continuing bargaining obligations on the employer, while the other merely refuses to lift responsibility for mediating and resolving existing disputes with former employees. Where a union seeks to resolve a deceased employee's grievance, the interests of the deceased and current employees continue to be aligned, despite the death. The shared goal is the robust enforcement of the just-cause provision, which is important not only to the discharged employee, but also to active members of the bargaining unit.

The parties agree that Stracener's claim for wrongful discharge was subject to the CBA during his lifetime. Because this claim arose while Stracener was an employee, the CBA continues to control his claim and mandate arbitration of it, even after his death.

B

There remains the issue of whether some other legal principle revokes the CBA's mandatory arbitration in the aftermath of Stracener's death. At oral argument, Silgan invoked the principles of agency law to argue for such a revocation. Silgan argues that the Union was Stracener's agent, and that after Stracener's death, the Union lost the power to compel arbitration because, under agency law, it could not assert the interests of a deceased principal.

Silgan is correct that if Stracener were the principal and the Union were the agent, then upon Stracener's death, basic principles of agency law would deprive the Union of power to enforce the CBA on Stracener's behalf. See Wood v. Hudson, 823 S.W.2d 158, 160 (Mo. Ct. App. 1992) ("The principal-agent relationship . . . is terminated by death.").

We conclude, however, that the Union was not Stracener's agent.[2]  Unlike a

---

[2]We decline to more broadly define the relationship between employees and unions outside the facts of this case.  However, we do note that it is possible that this relationship might not be amenable to principal-agent analysis at all.  As commentator and former Solicitor General Archibald Cox noted:

> In my judgment it is a mistake to attempt to force agreements between labor unions and employers into more familiar legal pigeonholes such as usage, third party beneficiary contracts, or contracts negotiated by the union as agent for the employees as principals.  The law has always had trouble with tripartite relationships; and in the labor field there are additional complications.  The parties affected by a collective bargaining agreement are employer, union, and many individual employees.  The identity of the individual employees may change from day to day; Joe Smith quits but Annie Jones is hired.  Often several employees have conflicting interests, as where the claim is that some are being permitted to deprive others of work by doing jobs outside of their own classification.  The second party—the labor union or collective bargaining representative—is in a very real sense only the third party—the individual employees—acting as an organized group through its agents and through constitutional processes.  The group interests, however, may conflict with the claims of individuals because several classes of individuals have divergent interests, because the demands of group organization and coherence clash with individual self-interest, or even because the union officialdom is not immediately responsive to the wishes of a numerical majority of the members.  Since experience offers no factual parallel to these arrangements, no other legal conception is quite analogous.

Archibald Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601, 604 (1956); see also Yolton v. El Paso Tennessee Pipeline Co., 668 F. Supp. 2d 1023, 1034–35 (E.D. Mich. 2009) ("The Court recognizes that two of the essential elements of agency are absent in the relationship between a union and its retired employees—the principal's right to control the agent and the agent's fiduciary duty to the principal.  This suggests that agency principles perhaps should not be applied.").

true principal, an individual employee covered by the CBA does not have power to override the Union's wishes. See State ex rel. Ford Motor Co. v. Bacon, 63 S.W.3d 641, 642 (Mo. 2002) ("Agency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." (internal quotation marks omitted)). An employee, for example, lacks the power to bring or arbitrate his or her own grievance, and instead must rely entirely on the Union to do so. The CBA also empowers the Union to exert significant and often exclusive control over the grievance process. Under the CBA, if the employee and his immediate supervisors cannot satisfactorily resolve the employee's grievance, the Union not only has discretion over whether to proceed further, but also takes control of the grievance process going forward. In fact, at the initial meeting after the Union takes over the grievance process, the CBA allows for the presence of the individual employee only "upon prior request of the Union." If the grievance or dispute is not resolved through this initial procedure, the CBA calls for arbitration between the "parties" of the CBA, which the CBA defines as the employer and the Union.

Moreover, under this CBA, as is often the case with CBAs, employees do not have standing to bring an action against the employers unless the employee can show lack of fair representation by the Union. See, e.g., Blanchard v. Simpson Plainwell Paper Co., 925 F. Supp. 510, 515 (W.D. Mich. 1995) ("Because plaintiffs are individual employees who were not parties to the arbitration, they lack standing to challenge the arbitration decisions upholding their discharges."); Katir v. Columbia Univ., 821 F. Supp. 900, 901 (S.D.N.Y. 1993) ("In accordance with the collective bargaining agreement, the parties to the arbitration were [the employer] and the Union. Because [the employee] was not a party to the arbitration, she lacks standing to petition to vacate the Award."); Acuff v. United Papermakers & Paperworkers, AFL-CIO, 404 F.2d 169, 171 (5th Cir. 1968) ("[T]o some extent the interests of particular individuals are subordinated to the interests of the group both at the contract negotiation stage and thereafter. . . . If the individual employee could

compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation." (internal quotation marks omitted)).

Finally, the Union does not consider only the interests of the individual employee it represents, as it would were this a true agent–principal relationship. See Kahn v. Royal Banks of Mo., 790 S.W.2d 503, 507 (Mo. Ct. App. 1990) ("An agent who acts for a purpose unrelated to the principal's welfare violates this duty of loyalty, which requires an agent to place his principal's interest above all others, including the agent's."). In deciding whether to bring a grievance, for instance, the Union considers not only whether the individual employee wishes to pursue that grievance, but also whether such a grievance is in the interests of the represented employees as a whole.

Because we hold that Stracener was not the principal and the Union was not his agent, agency law does not require us to hold that the Union lost the power to enforce the CBA on Stracener's behalf when Stracener died.

III

The CBA's mandatory arbitration provision applies to Stracener's grievance. The fact that Stracener died before arbitration proceedings commenced does not render the Union unable to enforce the CBA's arbitration provision on his behalf. Accordingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

_____