IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| TIMOTHY LUNDQUIST, and a class of similarly situated individuals, | ) ) ) | No. 80211-9-I |
| Respondents, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| SEATTLE SCHOOL DISTRICT NO. 1, | ) ) | |
| Appellant. | ) ) | |

ANDRUS, A.C.J. — Timothy Lundquist, a former teacher with the Seattle School District No. 1 (the District), alleges the District owes him compensation under the terms of a long-term disability insurance policy provided to school employees by Standard Insurance Company. The District moved to dismiss his claim because Lundquist did not exhaust the grievance procedures of his Collective Bargaining Agreement (CBA). The trial court denied the motion, finding Lundquist's claim to be outside the scope, and independent, of the CBA. We reverse and remand for the trial court to dismiss Lundquist's claim without prejudice.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Timothy Lundquist taught middle school language arts and physical education at the Salmon Bay K-8 School within the District from January 1999 to May 2017.  He was diagnosed with Parkinson's disease in July 2015.  Because of his condition, Lundquist took a paid leave of absence beginning in March 2017.  Shortly thereafter, he applied for long term disability compensation through Standard Insurance Company (Standard) and began receiving those benefits in May 2017.

As a teacher in the Seattle School District, Lundquist was a member of the Seattle Education Association (SEA), which represents "certificated non-supervisory educational employees" of the District, including teachers.

The SEA and the District negotiated the terms of the 2015-2018 CBA, which governs many aspects of the employee-employer relationship and includes provisions for compensation, work hours, procedures for taking a leave of absence, and employee benefits.  Under the CBA, the District (identified as "SPS" in the CBA) was required to enter into a written individual contract with each employee "in conformity with the provisions of this Agreement and the laws of the State."  The CBA provided that District policies, rules, regulations, procedures, and practices relating to wages, hours, and other terms and conditions of employment not in conflict with the CBA remained in effect unless modified by agreement with the union.

The CBA detailed how teachers, including Lundquist, were to be paid. Each teacher received compensation under an "Individual Employee Contract" (IEC) and a "Supplemental Contract." The IEC provided a salary pursuant to a schedule negotiated with the SEA. Teachers also received "Time, Responsibility and Incentive" compensation, or TRI pay. The TRI pay was set out in each teacher's separate Supplemental Contract, referred to in the CBA as the TRI Contract, the terms of which were included as Appendix C to the CBA. The CBA detailed the types of duties considered part of the annual base salary covered by the IEC, and those duties considered part of the TRI pay.

Lundquist received both an annual base salary under his IEC, and TRI pay under a TRI Contract. Both of his contracts directly referenced and incorporated the terms of, and duties set out in, the CBA.

The District also provided employees with certain insurance benefits. Margaret White, the District's insurance broker, testified that all of the District's insurance benefits are funded by contributions from the State of Washington and supplemented by local funding. Washington school districts are allowed to use state benefits to provide employees up to five basic insurance benefits: medical, dental, vision, life and long-term disability. The District provides all five benefits to all of its employees.

But the amount the District contributes toward these benefits for teachers is governed by the CBA. Under a CBA provision entitled "Group Insurance Provisions," the District agreed to contribute premiums toward approved "Group Insurance Programs" through a "Group Insurance Pool." The District agreed to

contribute the same amount as the State in a monthly allocation for insurance benefits. A separate CBA provision entitled "Pooling" provides:

> It is the intent of SPS as per agreement with the SEA to provide the SPS's contribution to the Group Insurance Fund for certificated employees of SPS to the fullest extent allowed by the Group Insurance Fund Pool. The SPS recognizes that the total amount contributed to the pool for any individual may not be fully utilized due to some employees selecting less coverage than would be paid by the SPS. Therefore, the SPS will identify any unutilized portion of the contributed amount for group insurance and distribute such amount, if any, to enrollees whose coverage exceeds the full share rate.
>
> > a. Beginning with the 10/01 pay warrants, the SPS's maximum contribution rate to the pool shall be the State monthly allocation figure for insurance benefits.
> > . . . .
> >
> > c. Figures used by the SPS to compute the cost of projected premium increases and projected changes in employee participation in insurance programs shall be developed by the SPS in consultation with the SEA.

White described how the District's "pooling" of insurance benefits, as described in the CBA, worked: "All benefits funds that are not used because an employee waives coverage or chooses a less expensive benefit plan are redistributed to employees with out-of-paycheck costs. This is called 'pooling.'" To the extent this funding did not fully cover any employee's premiums, employees paid out-of-pocket for the remainder.[1]

According to White, all insurance benefits the District provides are selected and approved by the "Joint Insurance Committee," or JIC, which is a group of

---

[1] When hired, all employees covered by the CBA receive copies of their individual contract, the salary schedule, the CBA, and the District's "Group Insurance Program Booklet," insurance enrollment forms, and "an explanation of the SPS's contributions to the premiums." This booklet is not in the record before us.

union-appointed employee representatives and District staff. This group includes representatives from the SEA. The JIC meets regularly to decide whether to renew an insurance policy, to change a carrier, or to change or amend the terms of these policies. Because any increase in premiums would come directly from an employee's out-of-pocket premium costs and affect the benefits pool, JIC has extensive discussions about the value of any benefits and the relative cost of increasing premiums. White testified the JIC approved the long-term disability insurance policy and benefits provided by Standard.

In addition to provisions relating to compensation and group benefits, the CBA also set out teachers' rights to take both short and long term leaves of absence. Any employee unable to perform his duties due to a medical disability is eligible for long term disability leave up to one year. If a second year of leave is necessary, the employee may apply for an additional year upon written request to the District's Human Resources Department. Any employee granted leave for two years or less "will be returned to service" by applying for a vacancy through the hiring process set out in the CBA. Any employee who has been on leave for more than one year is deemed a "displaced" staff member under the agreement. That displaced employee's right to return to a teaching position is set out in detail in the CBA's staffing and hiring provisions.

In the 2016-2017 academic year, Lundquist took paid leave from March 22, 2017 through June 26, 2017. On June 19, 2017, the District notified Lundquist that as an employee on a leave of absence, he was still considered a District employee and required to sign a teaching contract for the upcoming academic year. Corinne

Ross, a member of the District's Human Resource Department, sent Lundquist an email on June 21, 2017, asking Lundquist if he intended to extend his disability leave through the new school year. In response, Lundquist asked Ross if extending his leave would affect his right to return as an employee in the future. Ross informed Lundquist that he could come back to the District after a second year of leave in a "displaced" status, information consistent with the CBA's leave provisions. Lundquist then notified Ross he intended to continue his leave, and he executed the new contracts for the 2017-2018 academic year on June 24, 2017.

Lundquist was again on paid leave during the 2017-2018 academic year from September 6, 2017 through November 13, 2017. At that point, he took unpaid leave from November 14, 2017 through March 30, 2018. On March 30, 2018, Lundquist resigned from the District by executing a "Notice of Separation." He indicated on this form that he was resigning for medical reasons. Lundquist testified that he identified his last date of employment as March 30, 2018 at the District's direction.

In the spring of 2017, while on medical leave, Lundquist applied for and began receiving long term disability benefits from Standard. Under Standard's long term disability policy, eligible employees receive benefits based on 60 percent of the employee's pre-disability "insured earnings," reduced by "income from other sources." The policy defines "insured earnings" as the employee's monthly earnings from the District "including deferred compensation, but excluding bonuses, overtime pay, and any other extra compensation." The policy's rules for computation specify that "[i]f you are paid on an annual basis, your annual rate of

earnings is your annual contract salary." It further specifies that "[i]f you are paid on any other basis, your annual rate of earnings is your earnings for the period you are regularly scheduled to work each year."

When Standard initially began paying disability compensation to Lundquist in May 2017, its payments were based on a combination of his pre-disability base salary under his IEC and the locally-funded TRI pay he received under his TRI Contract. Two months later, Standard sent Lundquist a letter, indicating it had overpaid him because it viewed compensation under the TRI Contract to be excluded "extra compensation." Lundquist requested an internal review of this decision by Standard. In December 2017, Standard completed its review and concluded that Lundquist's annual earnings did not include compensation under the TRI Contract.

In 2019, Lundquist filed this lawsuit against the District, claiming the District was contractually liable under Standard's insurance policy for his disability compensation and he was entitled to have that compensation calculated based on the combination of his pre-disability base salary under the IEC, his additional TRI pay, the amount the District contributed toward the cost of health insurance, and Lundquist's deferred compensation.

The District asserted, as an affirmative defense, that Lundquist had failed to exhaust his contractual remedies under the CBA's grievance procedures. Article X of the CBA, entitled "Grievance Provisions," provided that if a "grievance" arose between any employee covered by the CBA, known as a "grievant," and the

District, the CBA required the employee to resolve the grievance through a four-step procedure. A "grievance" was defined under the CBA as:

> [A] claim based upon an event or condition which affects the conditions or circumstances under which an employee works, allegedly caused by the misinterpretation or inequitable application of written SPS regulations, rules, procedures, or SPS practices and/or the provisions of this Agreement.[2]

Each of the four steps in the grievance process is mandatory and failure to follow the procedures will result in "the grievance being dropped." If, at the conclusion of the first three steps of the process, the grievant remains unsatisfied, the SEA may "submit the grievance to final and binding arbitration." Under article X, section D(4), the only party entitled to demand binding arbitration on a grievance is the union. If the SEA files a notice of its intention to arbitrate with the Department of Labor Relations, an arbitration is conducted pursuant to the rules of the American Arbitration Association or the Federal Mediation Conciliatory Service. If the union does not notify the District of a demand for arbitration within the 60 days allowed under the CBA, that grievance is "deemed withdrawn." The arbitrator's decision "shall be final and binding on the employee involved and the SPS."

It is undisputed that Lundquist did not follow the grievance procedures before initiating this lawsuit against the District.

The parties filed cross motions for summary judgment on the sole issue of the applicability of the CBA to Lundquist's claims. The District asked the trial court to dismiss Lundquist's claims based on his failure to exhaust the grievance and

---

[2] Excluded from the scope of the grievance procedures are "matters for which law mandates another method of review." Lundquist does not contend this exclusion applies here.

arbitration process required by the CBA. Lundquist asked the court to rule that the District's CBA-based affirmative defense did not cover Lundquist's contract claim.

The trial court granted Lundquist's motion and denied the District's. In doing so, the court made the following findings of fact and conclusions of law:

> The Court concludes that the collective bargaining agreement (CBA) between the Seattle School District and the Seattle Education Association does not govern this dispute and judgment as a matter of law is appropriate as to that issue. The Court's findings are as follows:
>
> The Court finds that Lundquist was not an "employee" of Seattle School District for purposes of union representation when he began receiving long-term disability benefits because he was within the category of persons who had "ceased work without expectation of further employment": his physician had deemed him unable to work in any profession, he had ceased working, and there was no expectation of future employment.
>
> The Court further finds that Lundquist was not required to grieve this issue under the CBA because he is not claiming that Seattle School District violated any term of the CBA and no terms of the CBA require interpretation to resolve his claims.
>
> The Court finds that Lundquist's claims are independent of the CBA because they arise from a unilateral contract between Seattle School District and its employees. This finding is supported, in part, by the fact that all district employees receive long-term disability coverage administered through Standard regardless of whether or not they are subject to a CBA.

The District appeals.[3]

<u>ANALYSIS</u>

The District contends the trial court erred in concluding Lundquist's claims are not subject to the grievance procedures of the CBA. We agree. First, the

---

[3] Lundquist argues the trial court's summary judgment orders are not appealable as a matter of right. We need not resolve that issue because we conclude discretionary review under RAP 2.3 is appropriate. We therefore deny Lundquist's motion to modify the commissioner's ruling accepting review.

record does not support the trial court's finding that Lundquist was not a District "employee" when his contract claim arose. Second, any contention that Lundquist's annual earnings should include TRI pay require an interpretation of the CBA's provisions relating to the duties covered by a teacher's annual base salary and those duties covered by TRI pay. Finally, the record does not support the trial court's alternative finding that an independent, unilateral contract existed under which the District agreed to pay disability compensation to Lundquist. We therefore reverse.

We review summary judgment orders de novo, performing the same inquiry as the trial court. Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact is one that affects the outcome of the litigation. Janaszak v. Dep't of Soc. & Health Servs., 173 Wn. App. 703, 711, 297 P.3d 723 (2013). "By filing cross motions for summary judgment, the parties concede there were no material issues of fact." Pleasant v. Regence BlueShield, 181 Wn. App. 252, 261, 325 P.3d 237 (2014).

Lundquist first contends he was not required to grieve his disability compensation claim because he was not a "grievant" under the CBA when that claim accrued. Neither the plain language of the CBA nor the undisputed evidence supports this argument.

We apply contract law to the interpretation and construction of collective bargaining agreements. Navlet v. Port of Seattle, 164 Wn.2d 818, 842, 194 P.3d 221 (2008). We search for intent of the parties through the objective manifest language of the contract itself. Id. The interpretation of an unambiguous contract is a question of law reviewed de novo. Paradise Orchards Gen. P'ship v. Fearing, 122 Wn. App. 507, 517, 94 P.3d 372 (2004).

The CBA defines a "grievant" as "an employee . . . of the [District] covered by this Agreement having a grievance." The CBA defines an "employee" as "a certificated non-supervisory educational employee represented by the SEA." The undisputed evidence demonstrates that Lundquist was an employee represented by the union when his contract claim arose, making him a "grievant" under the CBA.

The trial court found that Lundquist was not an employee "for purposes of union representation" when he began receiving his disability benefits in May 2017 because "he was within the category of persons who had 'ceased work without expectation of further employment': his physician had deemed him unable to work in any profession, he had ceased working, and there was no expectation of future employment." But this finding is inconsistent with the unambiguous language of the CBA and the evidence of Lundquist's entitlement to union representation while employed but on a disability leave.

Lundquist first contends that under federal labor law, he was no longer an "employee represented by the SEA" as soon as he took disability leave and had no reasonable likelihood of returning to work, citing to Allied Chemical & Alkali

- 11 -

Workers of America v. Pittsburg Plate Glass Co., 404 U.S. 157, 168, 92 S. Ct. 383, 30 L. Ed. 2d 341 (1971). But that case is inapplicable to the facts of this case. There, the Supreme Court held that employers were not obligated to bargain with unions over benefits for retired workers because retired workers were not "employees" as that term was used in the National Labor Relations Act (NLRA)[4] because they had "ceased work without expectation of future employment." Id. at 168, 172. It further held that retirees could not properly be joined with active employees in the same bargaining unit under the NLRA because the two groups did not share a community of interests broad enough to justify including retirees. "Pensioners' interests extend only to retirement benefits, to the exclusion of wage rates, hours, working conditions, and all other terms of active employment." Id. at 173.

Allied Chemical does not control because at the time Lundquist's contract claim accrued in July 2017,[5] he had neither resigned his employment with the District nor retired. He was on a paid leave of absence with the District until November 13, 2017, and then on an unpaid medical leave until he resigned in March 2018. Lundquist had contractual rights guaranteed by the CBA while on disability leave, even if he believed it unlikely he would ever return to work. While on leave, Lundquist had the right to return to his pre-disability position during the first year of his leave and, if the leave extended into a second year, he had the

---

[4] 29 U.S.C. §158(a) *et seq.*
[5] Lundquist's contract claim accrued when Standard denied him pay to which he claims he was contractually entitled. See Schwindt v. Commonwealth Ins. Co., 140 Wn.2d 348, 353, 997 P.2d 353 (2000) (a contract claim accrues when the insurance company breaches the contract by wrongfully denying coverage). Lundquist testified that he began receiving disability payments in May 2017, and Standard notified him of its miscalculation in July 2017. Lundquist's contract claim would have accrued no later than July 2017.

right to seek a different position as an employee in "displaced" status. There is no evidence to suggest that Lundquist lost his status as an employee and his right to union representation under the CBA simply by taking a medical leave.

The record further demonstrates that Lundquist was contemplating a return to work even though he sought disability compensation from Standard. Standard began paying him in May 2017. The next month, the District sent Lundquist new employment contracts for the 2017-2018 school year and asked him if he intended to extend his leave. Lundquist specifically asked the District if he could extend his leave and retain the right to return to work. When the District confirmed he could return in a "displaced" status, Lundquist informed the District he wanted to continue his leave and executed the new employment contracts. Lundquist testified he applied for disability insurance benefits through Standard because he could no longer work, and the District was aware of this fact because the District assisted him in applying for disability pay. But he applied for disability with Standard before signing new employment contracts and asking the District to extend his medical leave of absence. It was at Lundquist's request that he remained an employee of the District while receiving long term disability compensation from Standard.

Had the District denied Lundquist's request to extend his leave or denied him the opportunity to return to work, the CBA provided Lundquist with the right to union representation to grieve the denial of those rights under the CBA. It is thus impossible to harmonize the CBA leave provisions with the trial court's finding that Lundquist was no longer an "employee" of the District for purposes of union representation when his contract claim accrued.

Lundquist seeks to extend the holding of Allied Chemical to employees who have become disabled and are physically unable to return to work. But the case law on which Lundquist relies does not support his contention that he was no longer entitled to union representation while on a medical leave of absence.

Lundquist points to Meza v. General Battery Corp., 908 F.2d 1262 (5th Cir. 1990) for the proposition that disabled employees, although still on an employer's payroll, have no right to union representation. But the facts of the Meza case demonstrate that the employee was in fact not on his employer's payroll at the relevant time. In that case, Meza suffered brain damage in December 1982 and was officially terminated as an employee in May 1983 at which time his union membership ended. Id. at 1264. He sued his employer and its insurance carrier seeking to recover worker's compensation benefits, occupational disability benefits, and a lump sum pension payment under a collective bargaining agreement's pension plan. Id.

The district court dismissed his worker's compensation and pension claims for failure to exhaust administrative remedies in the CBA and the pension plan. Id. at 1264-65. It dismissed his claim for occupational disability compensation because his former union had filed a lawsuit seeking the same benefits for three different employees and the court concluded Meza was bound by an adverse decision in that prior lawsuit. Id. at 1265.

The Fifth Circuit affirmed the dismissal of the pension plan claim, concluding Meza failed to exhaust mandatory administrative procedures. Id. at 1278. It reversed the dismissal of the occupational disability claim, concluding the doctrine

of res judicata did not apply to Meza: he was not a party to the union's lawsuit, the union had not certified a class to include him, Meza was not a union member at the time the union initiated its separate lawsuit, and the union had not sought reinstatement for Meza. Id. at 1269. The court suggested the union probably could not have represented Meza:

> The Union did not seek Meza's reinstatement, nor could it have done so; as a totally disabled person, Meza seems to fall squarely in the category of persons who have "ceased work without expectation of further employment."

Id. (quoting Allied Chemical, 404 U.S. at 168). But the court's reference to Allied Chemical must be read in context. It was undisputed that the union did not represent Meza when the union initiated a lawsuit seeking compensation for three different employees because Meza had already been terminated from his employment.

There is nothing in Meza to support the conclusion that Meza lost his entitlement to union representation before his termination occurred. Indeed, Meza did not appeal the dismissal of his CBA-related claim for failure to exhaust CBA grievance procedures, a fact that directly undercuts Lundquist's contention that CBA grievance procedures can never apply to a disabled employee.[6]

---

[6] Lundquist's reliance on Meza also assumes that a "totally disabled" person who has ceased working will never return to work. This assumption is not supported by the language of the Standard disability insurance policy or by the record here. Under the insurance policy, "total disability" includes pregnant women. A pregnant woman may be totally disabled for some period of time during her pregnancy, but it does not logically follow that when she takes a medical leave, she has no expectation of ever returning to work. Indeed, the Standard policy provides District employees with a "return to work" incentive. Even an employee who qualifies for long term disability benefits because of a disability is eligible for certain benefits as a way to encourage that person to return to work. Id.

The inquiry is not whether Lundquist had an expectation of returning to work at the end of his leave of absence but whether Lundquist's claim arose while he was employed by the District and entitled to union representation. See Sheet Metal Workers Local No. 2 v. Silgan Containers Mfg. Corp., 690 F.3d 963, 967 (8th Cir. 2012) (Allied Chemical did not apply to claims arising during the course of employment even though employee died before grievance could be resolved). It is undisputed that the District considers employees on disability leave to be employees. In June 2017, the District sent Lundquist employment contracts to sign for the 2017-2018 school year and told him that "[a]ll employees that are on a leave of absence are still considered district employees." Lundquist signed contracts for the 2017-2018 school year and continued to be a dues-paying member of the union until November 30, 2017. He presented no evidence that the union ever declined to represent him while on medical leave.

We conclude that Lundquist was an employee represented by the SEA at the time his breach of contract claim accrued and was thus a "grievant" under the CBA.

The District next argues Lundquist's claim falls within the definition of a "grievance" under the CBA. The trial court found that "Lundquist was not required to grieve this issue under the CBA because he is not claiming that Seattle School District violated any term of the CBA and no terms of the CBA require interpretation to resolve his claims." It alternatively found that Lundquist's claims are "independent of the CBA because they arise from a unilateral contract between

[the District] and its employees." Neither finding is supported by the language of the CBA or the record below.

First, the CBA broadly defines a "grievance" as a "claim based upon an event or condition which affects the conditions or circumstances under which an employee works, allegedly caused by misinterpretation or inequitable application of written [District] regulations, rules, procedures, or [District] practices and/or the provisions of this Agreement." The definition of "grievance" covers more than claims the District breached the CBA. That Lundquist does not allege the District violated the CBA is immaterial.

Second, Lundquist's allegations clearly relate to his working conditions. Lundquist alleges Standard's insurance policy imposes a direct obligation on the District to provide benefits Standard refused to pay. He alleges the District failed to pay sufficient premiums and to report all regular earnings to Standard, and that it has erroneously interpreted the policy by excluding TRI pay from the computation of disability pay. He is directly challenging the District's procurement of disability insurance, its interpretation of the scope of the policy, and the nonpayment of direct benefits under that policy—all of which fall within the definition of District "procedures or practices."

Third, Lundquist's claim is not "independent of the CBA." The Standard policy defines an employee's monthly "insured earnings" as "one-twelfth (1/12th) of your annual rate of earnings from your employer, including deferred compensation, but excluding bonuses, overtime pay, and any other extra compensation." Determining whether Lundquist's compensation under his TRI

- 17 -

Contract is interpreted as his "annual rate of earnings" or excluded as "extra compensation" turns on what he did to become entitled to his base pay and TRI pay. Resolving this issue depends on the duties he was expected to perform, as detailed in the CBA.

For example, a teacher's base employment contract provides compensation for 14 different enumerated tasks all listed in the CBA—from planning daily lessons, providing instruction, and administering assessments, to communicating with parents or guardians and participating in staff meetings. The CBA provides that compensation paid under TRI Contracts covers activities "beyond the basic contract, normal workday hours and school year," and includes such tasks as preparing for school opening; preparing the classroom before, after, and during the school year; providing individual help to students; researching educational materials and supplies; and attending school-connected meetings. Lundquist's TRI Contract required him to perform all of the TRI responsibilities as laid out in the CBA.

Resolving Lundquist's claim that CBA-enumerated TRI tasks fall within his "annual rate of earnings" as that term is used in Standard's insurance policy, will require reference to and an interpretation of the CBA. His claim falls squarely within the definition of a "grievance" under the CBA.

Lundquist argues his contract claim can be litigated in court without having to follow CBA grievance procedures because the District's obligation to pay disability compensation does not arise from the CBA. He relies on International Ass'n of Firefighters, Local 1789 v. Spokane Airports, 146 Wn.2d 207, 45 P.3d 186

(2002) to support this argument. But International Ass'n of Firefighters is distinguishable. In that case, the Spokane Airport contracted with the federal government to extend social security coverage to its fire department employees. Id. at 211. Under the agreement, union members paid 6.2 percent of their wages into a social security account and 1.4 percent of their wages into a Medicare account. The Airport matched these contributions. Id. In 1999, the employees opted out of the social security plan. The Airport received a refund from the federal government for all amounts paid into both accounts during a three year period. Id.

When the Airport refused to turn the funds over to the union, it sued for conversion on behalf of its members. Id. Ultimately, the Airport reimbursed the employees for the taxes withheld from the employees' paychecks but it refused to pay the union the matching sums it paid on its employees' behalf. Id. at 212. The Supreme Court held the claims being prosecuted on behalf of the union members fell outside the scope of the bargaining agreement's grievance procedures. Id. at 217. The CBA at issue there mandated arbitration of "disputes . . . involving interpretation or application of [the CBA]." Id. at 217. The Supreme Court concluded that the obligation to pay social security and Medicare taxes was not an obligation that arose from the CBA and thus was not a dispute involving the interpretation or application of the CBA. Id. at 217.

But Lundquist is not seeking to recoup improperly withheld social security or Medicare taxes. Nor does he claim conversion, as the union did in International Ass'n of Firefighters. And the grievance provision at issue here is broader than

the one at issue in <u>International Ass'n of Firefighters</u>. Reliance on that case is misplaced.

Finally, Lundquist asks us to affirm the trial court's finding that his claim is based on a unilateral contract, the terms of which fall outside the scope of the CBA grievance procedure. The trial court found:

> Lundquist's claims are independent of the CBA because they arise from a unilateral contract between Seattle School District and its employees. This finding is supported, in part, by the fact that all district employees receive long-term disability coverage administered through Standard regardless of whether or not they are subject to a CBA.

As with the trial court's other "findings" on summary judgment, the record simply does not support these findings.

Lundquist's sole claim against the District is a claim for breach of contract. In paragraph 12 of the First Amended Complaint, Lundquist alleges "[t]he Disability Plan itself is a unilateral contract offer by the District to its employees." He alleges that by offering this plan to its employees, the District "assumes contractual obligations to its employees under the Plan." In paragraph 32, he alleges "[t]he District failed its duty under the plan to ensure that employees receive long-term disability benefits based on their 'annual rate of earnings, including deferred compensation.'"

In any breach of contract action, a court must determine whether an enforceable contract has been created. <u>Storti v. Univ. of Wash.</u>, 181 Wn.2d 28, 35, 330 P.3d 159 (2014). A unilateral contract is created when one party makes a promise that a second party accepts only through performance of their end of the bargain. <u>Id.</u> at 35-36. Unilateral contracts are defined by traditional contract

concepts of offer, acceptance, and consideration. Id. at 36. In Storti, professors at University of Washington contended that by enacting a policy of providing a regular two percent merit salary increase to faculty and incorporating the policy into its employee handbook, the university made a contractual offer of merit pay that professors accepted by agreeing to serve in the academic year. Id. at 34. The professors argued the university breached this unilateral promise by rescinding the pay raise mid-academic year. Id.

The Supreme Court recognized an employee handbook provision may form the basis of a unilateral contract between an employer and employees. Storti, 181 Wn.2d at 36, citing Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 228-29, 685 P.2d 1081 (1984). The evidence presented by the faculty established an offer, acceptance and consideration. Id. at 38. But the university reserved the right to reevaluate the policy based on funding and the university followed its written procedures in reevaluating the policy. As a result, the court held suspension of merit raises did not constitute a breach of the unilateral contract. Id. at 39.

Thompson, the case on which Storti relies for the existence of an implied unilateral contract, requires proof of a promise of specific treatment in specific situations set out in an employee policy manual or other policy document. 102 Wn.2d at 229. Generally, whether a statement made by an employer amounts to a promise of specific treatment in a specific situation is a question of fact. Id. at 233 (reversing summary judgment); Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 540, 404 P.3d 464 (2017) (whether employee has reasonable expectation that employer will follow procedure in workplace and a

promise of specific treatment in specific situations is question of fact). The party asserting the existence of a unilateral contract has the burden of proving each essential element of such contract. Multicare Med. Ctr. v. Dep't of Soc. & Health Servs., 114 Wn.2d 572, 584 n.19, 790 P.2d 124 (1990), overruled in part on other grounds Neah Bay Chamber of Commerce v. Dep't of Fisheries, 119 Wn.2d 464, 832 P.2d 1310 (1992). Summary judgment is only proper if reasonable minds could not differ in resolving this question. Mikkelsen, 189 Wn.2d at 540.

We cannot determine the factual basis on which the trial court found the existence of a unilateral contract in which the District promised to provide disability compensation to Lundquist. The record demonstrates that in August 2014, the JIC issued a memo to District employees announcing open enrollment for insurance coverage. This memo provided:

> The District provides a monthly benefit contribution that will pay all or part of the cost of your basic benefits. . . . Enrollment on the dental, vision and life/long term disability plans is mandatory and automatic. . . . Enrollment in the medical coverage and other voluntary programs is optional.

The "Monthly Cost Worksheet" each employee completed contained the following note:

> Life and LTD Insurance—Your monthly cost for Life and LTD is based on your basic annual earnings (NOTE: Your basic annual earnings do not include other income, such as TRI). See the Life/LTD monthly premium sheet on page 9.

The JIC memo contained a chart indicating the monthly premiums an employee would pay for Standard's long term disability insurance, depending on that employee's "basic annual earnings."

While this evidence supports a finding that the District offered to contribute funds toward the cost of group insurance benefits, including long term disability insurance, we can find no evidence the District ever promised to pay disability compensation directly to an employee if Standard denied coverage. And the obligation to contribute toward these benefits originates in the CBA. Lundquist provided no proof of any separate policy or employee handbook in which additional promises were made to any District employees.

In this case, the CBA explicitly provides that "the SPS shall make funds available to contribute toward premiums of SPS-approved group insurance programs." It also provides for a method of pooling state and District contributions in a manner developed by the District in consultation with the union. The JIC explicitly discussed whether the Standard long term disability insurance policy should cover TRI pay and the enrollment documentation discloses to employees that TRI pay is not included in the "basic annual earnings" benefit of the disability insurance.[7]

The District does not determine whether any employee is eligible for disability benefits under Standard's policy. Standard alone makes that determination. The District similarly plays no role in calculating the benefits an

---

[7] According to White, in 2016, the JIC considered whether to ask Standard to include TRI pay in the long-term disability earnings calculation under the benefits it provides. The JIC wanted to assess whether including TRI pay in the definition of insured earnings would increase premium costs for the employees. This assessment was challenging because of the individualized nature of TRI pay. To White's knowledge, whether to include TRI pay in Standard's long-term disability benefits was unresolved and Standard based its employee premiums only on the base salaries of each teacher, excluding TRI pay. White testified that if Standard were to include TRI pay in calculating long term disability benefits, it would increase premiums and result in less money available in the Group Insurance Pool and increase employees' out of pocket costs for insurance.

employee is entitled to receive under Standard's policy; Standard alone makes that calculation as well. And Standard pays benefits directly to its insureds, like Lundquist. There are no District enrollment forms or any written policy in which the District guarantees any level of disability insurance benefits to its employees or in which the District has represented that other benefits, such as deferred compensation or health care benefits, would be included in Standard's calculation of long-term disability benefits.

Lundquist contends that the insurance policy itself creates the contractual duty of the District to pay the benefits described in the policy. But the policy clearly identifies Standard as the insurer, the District as the policyholder, and the employees as the insureds. The insuring clause of the long term disability policy indicates that "[s]ubject to all the terms of the GROUP POLICY, STANDARD will pay the LTD BENEFIT . . . upon receipt of satisfactory written proof that you have become TOTALLY DISABLED while insured under the GROUP POLICY." (Emphasis added). There is no provision in the insurance policy imposing this duty to pay on the District. It is clear from this language that Standard is the only party obligated to pay benefits under the policy.

Based on this record, the trial court erred in concluding as a matter of law that a unilateral contract exists under the terms of which the District is responsible to pay disability compensation to Lundquist or to any other employee.

Lundquist relies on Jacoby v. Grays Harbor Chair & Mfg. Co., 77 Wn.2d 911, 468 P.2d 666 (1970) and Vizcaino v. Microsoft Corp., 120 F.3d 1006 (9th Cir. 1997) (Vizcaino II) for the proposition that when an employer establishes a benefit

plan, the employer can be held contractually liable to its employees for non-compliance with the plan's terms, even when the plan is being administered by a third party.[8] These cases are distinguishable.

In Jacoby, former employees sued their employer and its insurer for violation of a pension plan contract. 77 Wn.2d at 912. The employer wrote a letter to each salaried employee announcing the establishment of the pension plan for those who worked until age 65. Each employee was furnished with a booklet explaining this plan and the conditions under which a terminated employee would be entitled to a deferred pension. Id. at 918. The employer then made regular deposits into the plan based on the number of its employees, their ages, length of service, annual salary, and life expectancy. Id. at 912-13.

The Supreme Court held that this employer-financed pension plan was contractual in nature. Id. at 915. Once an employee who accepted employment under that plan, complied with all conditions entitling him to participate in the plan, his rights become "vested," and the employer could not divest the employee of those rights. Id. at 916.

Jacoby is clearly distinguishable. In that case, the employer not only promised to finance 100 percent of the pension plan for its employees but it also actually did so. We have no such evidence here. The only evidence is the District's promise to contribute a certain dollar amount per employee, to match what the State paid, into a pool that would cover employee group benefits, which

---

[8] Lundquist also relies on Navlet v. Port of Seattle, 164 Wn.2d 818, 194 P.3d 221 (2008). However, that case is inapplicable because it involved a clear, written contractual obligation to pay welfare benefits, which were directly tied to the language of the CBA at issue in that case.

included long-term disability insurance purchased from Standard. The State and District contributions might cover the entire cost of an employee's premiums but they might not, depending on the "[f]igures used by the SPS to compute the cost of projected premium increases and projected changes in employee participation in insurance programs" developed "in consultation with the SEA."

Vizcaino is similarly unhelpful to Lundquist's case. In that case, Microsoft hired a group of independent contractors that the IRS later determined were actually common law employees. 120 F.3d at 1008-09. The workers sued Microsoft seeking benefits under Microsoft's Employee Stock Purchase Plan, which permitted employees to "purchase company stock at eighty-five percent of the lower of the fair market value on the first or on the last day of each six-month offering period through payroll deductions of from two to ten percent." Vizcaino v. Microsoft Corp., 97 F.3d 1187, 1191 (9th Cir. 1996) (Vizcaino I), on reh'g en banc, 120 F.3d 1006 (9th Cir. 1997).

The Ninth Circuit determined that, pursuant to Washington law, the stock purchase plan was a unilateral contract between Microsoft and the employees because the plan was "offered to all employees, the [w]orkers knew of it . . . and their labor gave them a right to participate in it." Vizcaino II, 120 F.3d at 1014. Analogizing the plan to a pension plan, the court reasoned that "consideration rendered for the promise in the pension contract of the employer to pay a pension is established when the employee is shown to have knowledge of the pension plan and continues his employment." Id. (quoting Dorward v. ILWU-PMA Pension Plan, 75 Wn.2d 478, 483, 452 P.2d 258 (1969)). The court ruled that, like a pension

plan, the stock option plan was deferred compensation for services rendered. Vizcaino II, 120 F.3d at 1014.

Vizcaino is also distinguishable because the benefit plan was not a promise to provide access to insurance but was instead a promise of compensation offered and funded entirely by the employer. In that case, there was no insurance company evaluating benefits eligibility, handling benefits calculations, or paying benefits, as exists here. Indeed, were Lundquist's claim viable, any employer who purchased employee health insurance from a third-party insurer would somehow become directly liable to its employees for the payment of health care expenses if the insurer refused to cover those expenses. We know of no case extending Vizcaino in that manner.

The record before us contains no evidence that the District ever offered to do anything other than contribute toward the purchase of insurance. Pursuant to the CBA provisions, the District and the union created the JIC to decide the type of insurance to offer to teachers:

> The District's Joint Insurance Committee (the JIC) is a long-standing committee served by members of the administration and major represented groups. The JIC meets regularly to discuss and review SPS employee benefits matters, including the plans that are offered, costs, service, and certain other fringe benefit matters that affect the employees of Seattle Public Schools.

From this, it was the JIC, and not the District, that chose to purchase the particular Standard insurance policy at issue here.

Based on this record, the trial court erred in finding the existence of a unilateral contract requiring the District to pay any disability compensation to Lundquist.

- 27 -

Lundquist's contract claim is a grievance subject to the CBA grievance procedures because he was an employee when his claim arose. His claim is not independent of the CBA and to resolve it requires an interpretation of the CBA's provisions regarding duties associated with annual base pay and TRI pay. We find no basis in the record for the finding that there is a "unilateral contract" to pay disability compensation to Lundquist. Accordingly, we reverse and remand this case to the trial court to dismiss Lundquist's claims against the District without prejudice.

_Andrus, A.C.J._

WE CONCUR:

_Bowman, J._           _Smith, J._